**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Mauro RESTREPO, Maureen McGinley, Manuel Lupio, Defendants–Appellants.**

**Nos. 90–50092, 90–50093 and 90–50094.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 10, 1991.

Decided April 10, 1991.

J. Williams Beard, Jr., San Diego, Cal., for defendant-appellant Restrepo.

Shawn M. Hayes, Asst. Federal Public Defender, San Diego, Cal., for defendant-appellant McGinley.

Jan Joseph Bejar, San Diego, Cal., for defendant-appellant Lupio.

John R. Kraemer, Roger W. Haines, Jr., Asst. U.S. Attys., San Diego, Cal., for plaintiff-appellee.

Before ALARCON, NORRIS and WIGGINS, Circuit Judges.

ALARCON, Circuit Judge:

Mauro Restrepo, Manuel Lupio, and Maureen McGinley were convicted of conspiracy to distribute, and possession of, eight kilograms of cocaine. Restrepo and Lupio seek reversal on the grounds that the evidence is insufficient to support the judgment of conviction. Restrepo also contends that he was incorrectly denied a two-point reduction for acceptance of responsibility under the Sentencing Guidelines. Lupio alleges that the district court erred in denying his motion for severance. McGinley claims that the district court erred in refusing to dismiss the indictment because of outrageous government conduct. We disagree with each of these contentions and affirm.

## FACTUAL BACKGROUND

John Arman and Maureen McGinley first met in 1979. McGinley was married at the time. McGinley's husband and Arman jointly participated in drug transactions. During this period of time, McGinley and Arman both used cocaine.

In 1983, McGinley obtained a divorce. She earned a college degree while working full time. She also stopped using cocaine.

In 1984, Arman contacted McGinley after not seeing her for two years. They had a brief affair. This relationship was terminated when Arman went to Mexico to avoid prosecution on a federal drug trafficking charge.

Arman returned to the United States in 1988, after serving a term of imprisonment in Mexico. Arman was arrested on a fugitive warrant in April 1988. At the time of his arrest, Arman was in possession of seven bags of marijuana and one ounce of cocaine. Following his arrest, Arman's attorney began efforts to negotiate an agreement that would dispose of charges that had been filed in federal and state courts. Arman sought dismissal or reduction of the charges in exchange for his cooperation with the Government. In April, 1988, Arman testified before a grand jury, as a government witness as part of a plea bargain that fell through.

In December of 1988, McGinley contacted Arman. Arman took her to a friend's house where cocaine was being consumed. Arman and McGinley each used cocaine. That evening they engaged in sexual activity. After approximately a month, McGinley and Arman moved to San Diego. McGinley met the woman with whom Arman was living in January or February 1989. Thereafter McGinley and Arman ceased their sexual relationship. Arman and McGinley did not terminate their friendship.

In January 1989, Arman asked McGinley if she knew anyone who could supply large quantities of cocaine. She said she might be able to contact one of her ex-husband's suppliers. On or around January 17, 1989, Arman asked McGinley to bring him a kilo of cocaine to sell. She did so. The Government was unaware that Arman was trafficking in narcotics when this transaction occurred.

On March 7, 1989, Arman orally agreed to help agents of the Drug Enforcement

Administration (DEA) gather evidence leading to the arrest of "Harold," a major drug supplier. Arman set up a meeting between McGinley and Special Agents Calise Couchman and Charles Jones of the DEA. McGinley met with Special Agent Jones or Special Agent Couchman five times and had at least six telephone conversations with them between March 7 and June 6, to discuss her sources and the amount of cocaine they wished to purchase. McGinley thought the officers were drug traffickers. At their first meeting, on March 8, 1988, McGinley sold Special Agent Couchman an ounce of cocaine for $1,000.

On June 6, 1989, McGinley introduced Special Agents Couchman and Jones to Mauro Restrepo as drug traffickers. Restrepo told Special Agents Couchman and Jones that he was "Harold's" partner. Restrepo told the officers he could supply large quantities of various grades of cocaine to them. He quoted a price of $15,500 per kilogram, in 25 to 30 kilogram lots. McGinley participated in the meeting. As a sign of their good faith, Special Agents Couchman and Jones showed Restrepo and McGinley a briefcase containing $180,000 in cash.

On June 7, 1989, and June 9, 1989, McGinley spoke on the telephone with Special Agent Jones concerning the proposed narcotics transaction. On June 10, 1989, she and Arman met with Special Agent Jones in San Clemente. McGinley stated that ten kilograms of cocaine had been shipped from Los Angeles. The shipment did not arrive.

On June 27, 1989, McGinley phoned Special Agent Jones and said that eight kilograms would be available the next day. On June 28, 1989, Special Agent Charles Teal observed Arman, McGinley, Restrepo, and Lupio meet for breakfast at a Denny's restaurant. They left at approximately 10:00 a.m. Restrepo drove a brown Oldsmobile. Lupio drove a white pick-up truck.

At about 12:30 p.m., on the same date, McGinley met with Special Agents Jones and Couchman. She told them that they could purchase eight kilograms of cocaine at the Fish Market restaurant in one hour.

She also informed them that Restrepo would be nearby and would deliver another twenty kilograms within hours of the successful transaction.

At approximately 1:40 P.M., Lupio drove the brown Oldsmobile (in which Restrepo had left Denny's restaurant) into the Fish Market restaurant parking lot, where Special Agents Jones and Couchman were waiting. Arman was with Lupio. Special Agent Jones walked to the car. Lupio immediately mentioned "dinero." Special Agent Jones said he wanted to see the packages. Lupio told Special Agent Jones to sit in the front seat. When Special Agent Jones did so, Lupio started the car and pounded on a spot on the front door. Two secret compartments in the rear doors then opened, revealing eight kilograms of cocaine. Special Agent Jones testified that he looked at Lupio after the compartments opened. Lupio smiled and "looked pleased." Special Agent Jones unwrapped one of the packages. It appeared to contain cocaine. Special Agent Jones gave a prearranged signal. Lupio was then arrested by other law enforcement personnel.

Restrepo and McGinley were across the street at the time of the arrest. They were also arrested, after a brief and futile attempt to escape.

A. *Issues Raised in Restrepo's Appeal*

1. Sufficiency Of The Evidence To Convict Restrepo Of Conspiracy.

Restrepo argues that there is insufficient evidence that he agreed to distribute cocaine. The standard of review for sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Government, a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Dorotich,* 900 F.2d 192 (9th Cir.1989).

Restrepo argues that because he speaks only Spanish, there is no evidence in the record that he understood the June 6, 1989, conversation concerning the sale of cocaine to the agents. Restrepo also asserts that

since there is no proof in the record that he received any money from the Special Agents or that he was present when the cocaine was delivered to them, the evidence is insufficient to demonstrate that he agreed to sell cocaine or was a member of the conspiracy. Restrepo maintains that the evidence produced by the Government shows mere association with Arman and McGinley. He asserts that, at most, the record demonstrates that he acquiesced in their illegal activity. We disagree.

> [I]t is clear that mere association with members of a conspiracy, or simple knowledge, approval, or acquiescence in the object or purpose of the conspiracy, without intention and agreement to accomplish a specific illegal objective, is not sufficient to make one a conspirator.

*United States v. Melchor–Lopez,* 627 F.2d 886, 891 (9th Cir.1980).

The record shows more than mere association and acquiescence. Restrepo was present at the June 6, 1989, meeting at which the arrangements were made to deliver cocaine to Special Agents Couchman and Jones. He told Special Agent Jones that he was "Harold's" partner and could provide significant quantities of cocaine. During these negotiations Restrepo quoted the price of cocaine and discussed the quantity he could deliver. Restrepo speculates that Arman could have created this conversation out of whole cloth because he "translated" the negotiations from Spanish to English. This contention finds no support in the record. The Special Agents testified regarding what Restrepo "told" them at their meeting. They testified that he "talked" with them. There is nothing in the record to support the contention that Arman acted as an interpretor for Restrepo. This same argument was presented to the jury by Restrepo's trial counsel. The jury rejected it.

Restrepo left the breakfast meeting on June 25 in the car in which the cocaine was later delivered. Restrepo watched the transaction from across the street and attempted to escape from the DEA agents.

The prosecution is not required to show that a conspiracy agreement was ex-plicit; the agreement may be inferred from the facts and circumstances of the case. *United States v. Hernandez,* 876 F.2d 774, 777 (9th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989). Circumstantial evidence, and proper inferences drawn therefrom, may sustain a conviction. *United States v. Hernandez,* 876 F.2d 774, 777 (9th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989). Once the conspiracy is established, evidence of even a slight connection to it is sufficient if shown beyond a reasonable doubt. *United States v. Taylor,* 802 F.2d 1108 (9th Cir.1986), *cert. denied,* 479 U.S. 1094, 107 S.Ct. 1309, 94 L.Ed.2d 164 (1987). The evidence was sufficient to persuade a rational trier of fact beyond a reasonable doubt that Restrepo knowingly agreed to participate in a conspiracy to sell cocaine.

2. Sufficiency Of The Evidence To Convict Restrepo Of Possession Of Cocaine.

Restrepo also asserts that there is insufficient evidence to show that he possessed the cocaine. He argues that there is no evidence that the cocaine was in the brown Oldsmobile when he was in the vehicle. Thus, he maintains that there is no evidence that he had dominion and control over the cocaine.

In order to show possession, the Government must prove that Restrepo had "dominion and control" over the contraband. *United States v. Penagos,* 823 F.2d 346, 350 (9th Cir.1987) (citing *United States v. Behanna,* 814 F.2d 1318, 1319 (9th Cir.1987) (quoting *United States v. Rodriguez,* 761 F.2d 1339, 1341 (9th Cir. 1985))). "Possession of a controlled substance under section 841(a)(1) 'may be constructive, as well as actual.'" *United States v. Disla,* 805 F.2d 1340, 1350 (9th Cir.1986) (quoting *United States v. Grayson,* 597 F.2d 1225, 1229 (9th Cir.), *cert. denied,* 444 U.S. 873, 100 S.Ct. 153, 62 L.Ed.2d 99 (1979)). Constructive possession may be shown by proof that the defendant had an ability to produce the drug through the use of agents. *Arrelanes v. United States,* 302 F.2d 603 (9th Cir.) (cit-

ing *Hernandez v. United States*, 300 F.2d 114 (9th Cir.1962)), *cert. denied*, 371 U.S. 930, 83 S.Ct. 294, 9 L.Ed.2d 238 (1962). It "may be demonstrated by direct or circumstantial evidence that the defendant had the power to dispose of the drug." *Disla*, 805 F.2d at 1350 (citing *Rodella v. United States*, 286 F.2d 306, 311, 312 (9th Cir. 1960), *cert. denied*, 365 U.S. 889, 81 S.Ct. 1042, 6 L.Ed.2d 199 (1962)). Constructive possession may also be shown by proof that the defendant participated in a joint venture, and thus shared dominion and control over the contraband. *United States v. Hernandez*, 876 F.2d 774 (9th Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989); *United States v. Valentin*, 569 F.2d 1069, 1071 (9th Cir.1978). The evidence is sufficient to show that Restrepo participated in a joint venture with Lupio and McGinley to sell cocaine to Special Agents Couchman and Jones.

### 3. Denial Of A Reduction For Acceptance Of Responsibility

■ Restrepo asserts that the district court erred in denying a reduction of the offense level for acceptance of responsibility under U.S.S.G. 3E1.1 because he did not provide substantial assistance to the Government. Restrepo appears to argue that consideration of a defendant's assistance to the Government is only appropriate when the sentencing court is considering a downward departure for substantial assistance to the Government under Section 5K1.1 of the Guidelines. Restrepo claims that the district court's comment that it considered the "truthfulness, completeness, and reliability" of his statements to the Government is an indication of improper reliance on Section 5K1.1 factors by the district court in making its decision whether to decrease the offense level for acceptance of responsibility. Whether or not a defendant has accepted responsibility for his crime is a factual determination we review for clear error. *United States v. Gonzalez*, 897 F.2d 1018, 1019 (9th Cir. 1990).

The record and the Guidelines do not support Restrepo's argument. The court did not indicate in any way that it was applying the factors set forth in Section 5K1.1 in denying a reduction for acceptance of responsibility. Furthermore, Section 3E1.1 requires a court to consider whether a defendant has made a "truthful admission to authorities of his involvement in the offense and related conduct." Thus, it was not error for the trial court to consider the "truthfulness, completeness, and reliability" of defendant's statements to government officials under Section 3E1.1.

In this matter Restrepo made no statement to the arresting officers. During the booking procedures he identified himself as Ricardo Vargas and denied that his true name was Restrepo, until he was confronted with his driver's license. He pleaded not guilty and put the Government to its burden of proof at trial. Upon being informed that Restrepo intended to appeal from the judgment of conviction, the probation officer did not discuss the facts that led to Restrepo's arrest.

■ The Commentary to Section 3E1.1 states that the adjustment for acceptance of responsibility "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." Restrepo stated to the probation officer that "the court should give me what I deserve, because I have been convicted." This statement does not reflect an acceptance of responsibility. Instead, it is simply a realistic acknowledgment that he was convicted by the jury and will be punished by the court.

■ In a letter to the court, prior to the sentencing hearing, Restrepo stated "[T]his act without a doubt has been the most shameful of my life." During the allocution, Restrepo "apologized to the people of the United States for the wrong I may have caused." Restrepo also told the court "[i]t's the first time that I've committed an offense of this magnitude". The district court was free to discount Restrepo's belated expression of remorse and repentance. The district court's determination that Restrepo's conduct did not demonstrate an ac-

ceptance of responsibility by his post-conviction statements is not clearly erroneous.

**B.  Issues Raised by Lupio's Appeal**

1. Sufficiency of the Evidence to Convict Lupio of Conspiracy.

■ Lupio argues that the evidence is insufficient to support the jury's verdict that he agreed to participate in a conspiracy. This contention lacks merit.

Lupio was present at the breakfast meeting of the conspirators on the day the cocaine was delivered. The record also shows that he engaged in conduct that furthered the object of the conspiracy. He transported the cocaine. He asked the undercover agents for the money. He opened the compartments in which the cocaine was hidden.

We "must respect the exclusive province of the jury to determine credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from the proven facts, by assuming the jury resolved all such matters in a manner which supports the verdict." *United States v. Gillock*, 886 F.2d 220, 222 (9th Cir.1989). The record contains sufficient evidence to persuade a rational jury beyond a reasonable doubt that Lupio knowingly entered into an agreement to distribute cocaine.

2. Sufficiency of the Evidence to Convict Lupio of Possession.

Lupio argues that there was no evidence from which the jury could conclude that he knowingly possessed the cocaine. "A person may not be convicted of illegal possession unless he knows contraband is present and is capable of exercising dominion and control over the contraband." *United States v. Penagos*, 823 F.2d 346, 350 (9th Cir.1987) (citing *United States v. Behanna*, 814 F.2d 1318, 1319 (9th Cir.1987) (quoting *United States v. Rodriguez*, 761 F.2d 1339, 1341 (9th Cir.1985))).

■ The record shows that Lupio drove the automobile to the place where the narcotics sale was to take place and opened the secret compartments that contained the cocaine. This evidence is sufficient to demonstrate that Lupio had dominion and control over the cocaine in the automobile.

3. Denial of Lupio's Motion for A Separate Trial.

Rulings on a motion for a separate trial are within the discretion of the trial court. *Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *United States v. Smith*, 893 F.2d 1573, 1581 (9th Cir.1990). We review to "determine whether 'joinder was so prejudicial that the trial judge was compelled to exercise his discretion to sever.'" *United States v. Marsh*, 894 F.2d 1035, 1040 (9th Cir.1989) (quoting *United States v. Lewis*, 787 F.2d 1318, 1321, *modified on other grounds*, 798 F.2d 1250 (9th Cir.1986), *cert. denied*, 489 U.S. 1032, 109 S.Ct. 1169, 103 L.Ed.2d 227 (1989)), *cert. denied*, —— U.S. ——, 110 S.Ct. 1143, 107 L.Ed.2d 1048 (1990).

■ It is well established in this circuit that a motion for severance must be renewed at the close of evidence or it is waived. *United States v. Smith*, 893 F.2d 1573, 1581 (9th Cir.1990); *United States v. Monks*, 774 F.2d 945, 949 (9th Cir.1985); *United States v. Gaines*, 563 F.2d 1352, 1356 (9th Cir.1977); *United States v. Figueroa–Paz*, 468 F.2d 1055, 1057 (9th Cir. 1972). Lupio did not renew his pretrial motion for severance at the close of trial. Therefore, the objection was waived.

**C.  Issues Raised on McGinley's Appeal**

■ McGinley seeks reversal of the order denying her motion for dismissal of the indictment on the ground that the evidence shows outrageous government conduct in obtaining the evidence against her. She argues that the Government is responsible for Arman's conduct because he was motivated by his desire to get a favorable plea bargain. McGinley contends that Arman would not have induced her to traffic in cocaine had it not been for his desire to cooperate with the Government. She maintains that Arman's conduct in engaging in sexual activity with her and in introducing her to crack cocaine was outrageous.

The dismissal of an indictment because of outrageous government conduct may be predicated on alternative grounds: a violation of due process or the court's supervisory powers. *United States v. Luttrell,* 889 F.2d 806, 811 (9th Cir.1989). We review de novo a denial of a motion to dismiss an indictment on due process grounds. *United States v. Williams,* 791 F.2d 1383 (9th Cir.), *cert. denied,* 479 U.S. 869, 107 S.Ct. 233, 93 L.Ed.2d 159 (1986). A denial based on a refusal to exercise the court's supervisory power is reviewed for abuse of discretion. *United States v. Simpson,* 813 F.2d 1462, 1465 n. 2 (9th Cir.), *cert. denied,* 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987). Factual findings upon which the decision was based are reviewed for clear error. *United States v. Emmert,* 829 F.2d 805, 807 (9th Cir.1987).

The argument that an indictment must be dismissed because of outrageous government conduct is derived from a comment by the Supreme Court in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In *Russell,* the Court stated that there may be situations "in which the conduct of law enforcement officials is so outrageous that due process principles would absolutely bar the Government from invoking judicial process to obtain a conviction." *Id.* at 431–32, 93 S.Ct. at 1642–43. We have also recognized that the court may exercise its inherent, supervisory powers to dismiss an indictment because of outrageous government conduct. *United States v. Simpson,* 813 F.2d at 1465 n. 2. *See also Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1975) (Powell, J. concurring).

■ A claim of outrageous government conduct differs from the defense of entrapment. The issue of entrapment "focus[es] on the intent or predisposition of the defendant to commit the crime." *United States v. Russell,* 411 U.S. at 429, 93 S.Ct. at 1641. The concept of outrageous government conduct focuses on the Government's actions. An indictment may be set aside because of outrageous government conduct whether or not the defendant was predisposed to engage in criminal activity. *United States v. Gonzalez,* 539 F.2d 1238, 1239–40 (9th Cir.1976).

To prevent the objective standard used in outrageous conduct analysis from "swallowing" the subjective test used in entrapment,

> a successful due process defense [based on outrageous government conduct] must be predicated on intolerable government conduct which goes beyond that necessary to sustain an entrapment defense.... While the lines between the objective test of entrapment favored by a minority of the Justices and the due process defense accepted by a majority of the Justices are indeed hazy, the majority of the Court has manifestly reserved for the constitutional defense only the most intolerable government conduct.

*United States v. Bogart,* 783 F.2d 1428, 1435 (9th Cir.1986) (quoting *United States v. Jannotti,* 673 F.2d 578, 607–8 (3rd Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982)). Thus, the defense applies only to conduct which "is so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. O'Connor,* 737 F.2d 814, 817 (9th Cir.1984) (quoting *United States v. Ramirez,* 710 F.2d 535, 539 (9th Cir.1983) (quoting *United States v. Ryan,* 548 F.2d 782, 789 (9th Cir.1976), *cert. denied,* 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977))), *cert. denied,* 469 U.S. 1218, 105 S.Ct. 1198, 84 L.Ed.2d 343 (1985).

We must first determine whether Arman was an agent of the Government at the time of the allegedly outrageous conduct. If he was not, then the defense is unavailable.

McGinley argues that Arman became a government agent when he began cooperating with the Government by testifying before a grand jury in April of 1988. The record does not support this argument. The record shows that Arman first became a government agent on March 7, 1989. On that date, Arman told Special Agents Jones and Couchman that he could set up a narcotics transaction. Prior to March 7, 1989, Arman was not involved in assisting the

Government in gathering evidence against persons engaged in distributing controlled substances.

In *United States v. Busby*, 780 F.2d 804 (9th Cir.1986), we held that a person does not become a government agent until his activities are under the direction and supervision of law enforcement officers. *Id.* at 807. No "agency relationship" is created simply because the informant expects to be rewarded for his conduct. *Id.*

■■■ The fact that a person testified before a grand jury does not automatically make him or her a government agent. Every person who has information that is relevant to a grand jury investigation must testify unless he or she is protected by a constitutional privilege. *See Branzburg v. Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972) ("the public ... has a right to every man's evidence") (quoting *United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950)). The fact that Arman may have been motivated to testify before a grand jury in April, 1988, to gain a reduction in charges pending against him did not create an ongoing agency relationship.

In *United States v. Simpson*, 813 F.2d 1462 (9th Cir.1987) we were also presented with the issue of when an informant's activities should be attributed to the Government. In *Simpson*, the FBI employed Miller, a known prostitute, to befriend Simpson and inform on his activities. Miller and a friend posed as stranded travelers at LAX and "enticed Simpson into giving them a ride into town." *Simpson*, 813 F.2d at 1464. Shortly, thereafter Miller and Simpson engaged in sexual activity. The FBI became aware of the conduct, but continued to use Miller as an informant. Miller introduced Simpson to undercover FBI agents, who said they wanted to purchase heroin. After selling heroin to the FBI agents, Simpson was arrested. *Id.* at 1464.

In rejecting a claim of outrageous government conduct, we held "that any outrage at Miller's deportment must be tempered by the fact that it is not as readily attributable to the Government as the conduct held to violate due process in previous cases." *Id.* at 1467. We noted that Miller had not been encouraged by the FBI to use sex. In fact, she had been told not to become sexually involved with Simpson. *Id.* We held "the Government's passive tolerance here of a private informant's questionable conduct to be less egregious than the conscious direction by government agents typically present in outrageous conduct challenges." *Id.* at 1468. We concluded in *Simpson*

that on the unique facts before us, taking into account both our reluctance to conclude that Miller's actions were so out of step with universal contemporary sexual norms that they "shocked the conscience" and the FBI's diminished culpability for Miller's sexual activity, the Government's conduct was not so outrageous as to bar prosecution of the defendants.

*Id.* In the matter *sub judice*, Arman's sexual activities with McGinley and their joint use of cocaine occurred before he was commissioned by the Government to assist in gathering evidence against narcotics traffickers. Moreover, the officers were not aware of Arman's alleged conduct until after he became a government agent.

Arman's testimony before the grand jury was unrelated to his engagement on March 7, 1989, to serve as a government agent in investigating the activities of narcotics dealers. The Government did not direct or control Arman's conduct during the time in which he engaged in sexual activities with McGinley or introduced her to crack cocaine. The Government is not responsible for Arman's actions prior to March 7, 1989. No violation of due process has been demonstrated. Because Arman was not a government agent at the time of the allegedly outrageous conduct, there is no occasion for us to exercise our supervisory powers.

The judgment of the district court is AFFIRMED.