19 F.3d 31
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Darcy Ira THIGPEN; Robert Ross, Dwayne Allen Falconer,
Defendants-Appellants.
 Nos. 93-50043, 93-50058 and 93-50067.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 7, 1993.
Decided Feb. 25, 1994.
 
 1
 Before: FLETCHER, PREGERSON and HALL, Circuit Judges
 
 
 2
 MEMORANDUM*
 
 
 3
 Appellants Thigpen, Ross, and Falconer separately appeal their convictions for possession of cocaine and cocaine base with intent to distribute, 21 U.S.C. Sec. 841(a)(1); conspiracy, 21 U.S.C. Sec. 846; possession of a firearm during a drug trafficking crime, 18 U.S.C. Sec. 924(c)(1); and being felons in possession of firearms, 18 U.S.C. Sec. 922(g). Thigpen and Falconer also appeal their sentences.
 
 
 4
 These appeals raise two suppression of evidence issues, two sufficiency of evidence issues, and two sentencing issues. First, Ross and Falconer argue that there was no probable cause to search Ross's house, while Thigpen raises a claim of unnecessary prearraignment detention. Second, Ross argues the evidence was insufficient to show that he used a short-barreled shotgun in relation to the cocaine sales, while Falconer argues the evidence was insufficient to convict him of possessing the cocaine. Third, Thigpen claims he was entitled to a downward departure because his career offender status overstated his real criminal history, while Falconer claims he was entitled to a two-point sentencing reduction for being a minor participant in the conspiracy.
 
 
 5
 We have jurisdiction pursuant to 28 U.S.C. Sec. 1291. We affirm.
 
 FACTS
 
 6
 The Bureau of Alcohol, Tobacco and Firearms ("ATF") first began to suspect that drug sales were occurring in an apartment at 209 East 62nd Street around June 15, 1992. On June 24, 1992, ATF Agent Veal directed a confidential informant (CI) to purchase cocaine from a man on the street near the apartment. After the CI made contact, the man went around the corner, into the apartment, and then came back and exchanged something with the CI. The CI later verified that the man had brought her $50 worth of cocaine.
 
 
 7
 On July 20, Agent Veal received two confidential tips that the East Coast Crips were selling cocaine at 209 East 62nd Street, and that they were always heavily armed. On July 29, Agent Veal directed a second CI, Martin, to purchase cocaine at the apartment. She testified that appellant Dwayne Falconer met her outside the building and escorted her to apartment three, outside of which appellant Robert Ross was standing. She bought $100 worth from Falconer. She later told Agent Veal that inside the apartment she had seen a revolver on the sofa. Martin was wearing a radio transmitter and her version of these events is corroborated by what the agents listening to the transmission heard.
 
 
 8
 ATF Agents observed a large amount of traffic into and out of the apartment on August 1 and 2. This traffic included appellant Darcy Thigpen on August 2.
 
 
 9
 On August 4, Agent Merenyi observed defendant Ross engage in various activities relating to the apartment and his house, which was across the street at 204 East 62nd Street (his activities are described in detail below). Ross was suspected of belonging to the East Coast Crips.
 
 
 10
 On the same day, Agent Veal again directed Martin to purchase cocaine at the apartment. She knocked on the door and was met by Thigpen. She gave him $100, and selected a package of cocaine from the same bowl she had been offered on her last visit. From her description, the Agents realized that Thigpen was the man who had just exchanged some keys with Ross.[1] Martin said she observed a large amount of cash on the table in the apartment.
 
 
 11
 Also on August 4, ATF Agent Veal submitted an affidavit and secured a search warrant for the apartment and for Ross's house.
 
 
 12
 At 4:00 a.m. on August 5, Martin was directed to purchase $50 worth of cocaine from the apartment. She went to the door and was met by Ross, who sold her the cocaine. Later that same day, Thigpen was observed entering the apartment, and Ross was observed walking back and forth between the apartment and his house.
 
 
 13
 At 9:00 a.m. on August 5, a SWAT team simultaneously executed search warrants for the apartment and the house. Thigpen was arrested outside of the apartment; Ross and Falconer were arrested in the house.
 
 
 14
 At the apartment, agents found several small quantities of cocaine, some packaged for sale (total weight, 34 grams). They found two handguns and ammunition on top of the refrigerator in the kitchen. They also found more than $10,000 in cash in the living room and bedroom.
 
 
 15
 At the house, agents found almost two kilograms of cocaine in a locked closet off one of the bedrooms. They also found numerous guns: a revolver in the bedroom, a rifle in the closet, a pistol under a mattress, and ammunition above the refrigerator. In the kitchen ceiling there was an attic opening. The attic was not easily accessible; one agent had to get on another's shoulders to reach inside it. He retrieved two shotguns (one sawed-off), an AK-47, a rifle, and a pistol.
 
 
 16
 After their arrests, defendants were taken to a local police station for holding while the ATF agents completed their searches. At the end of the day defendants were returned to ATF custody. All three waived their Miranda rights and made various incriminating statements. The next day they were taken to the courthouse for arraignment, but the United States Attorney did not complete a complaint against them until after 3:30, the time for the last calendar call for first appearances. The ATF therefore had a Magistrate sign a finding that probable cause existed to arrest them. They were formally arraigned the next morning.
 
 
 17
 On August 21, 1992, an eight-count indictment was returned against them, charging each with conspiracy, possession of cocaine and cocaine base with intent to distribute, use of a firearm during a drug trafficking crime, and being a felon in possession of a firearm. All three pled not guilty, and went to trial on October 13, 1992. On October 15, a jury convicted each of them on all counts of the indictment.
 
 
 18
 Thigpen was sentenced as a career offender to 420 months in prison. At his sentencing hearing, Thigpen argued that the district court should depart downward because his career offender status significantly over-represented his real criminal history.[2] The district court refused to depart downward.
 
 
 19
 Falconer was sentenced as a career offender to 480 months in prison. He argued at the sentencing hearing that he was entitled to a two-point downward adjustment because he had sold cocaine only once at 209 East 62nd Street, and was thus only a "minor participant" in the cocaine selling conspiracy. The district court did not depart downward on this basis.
 
 
 20
 Ross was sentenced to 308 months in prison.
 
 DISCUSSION
 I. Pretrial Issues
 
 21
 A. Suppression of Evidence--Ross and Falconer
 
 
 22
 Ross and Falconer contend that the district court should have suppressed the evidence gathered at 204 East 62nd Street because the search warrant was not based on probable cause. "Probable cause exists when, considering the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " United States v. Ocampo, 937 F.2d 485, 490 (9th Cir.1991) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). We review a magistrate's issuance of a search warrant for clear error. United States v. Bertrand, 926 F.2d 838, 841 (9th Cir.1991).
 
 
 23
 Ross and Falconer argue that "there were no allegations in [Agent Veal's] affidavit to indicate that it would be reasonable to seek evidence in the house located at 204 East 62nd Street." Falconer's Opening Brief at 20. We disagree. The affidavit strongly indicated that drug sales were occurring in the apartment. The affidavit connected the house to the apartment via Ross. It stated that Ross came out of the apartment, moved his car from in front of the house to in front of the apartment, entered the house, came back out and gave some keys to a person who entered the apartment, and drove away. The person who entered the apartment (later identified as Thigpen) then sold CI Martin cocaine. Ross returned, reentered the house, came out, and went over to talk through the window to somebody in the apartment. The affidavit also states that the cocaine sales at the apartment were conducted by the East Coast Crips, and that Ross was a member of the East Coast Crips. Finally, Agent Veal stated that, based on his eight years of police experience, drug dealers typically keep drugs at a "stash house" different from the distribution location, and that he believed the house to be a stash house.
 
 
 24
 The fact that the affidavit very clearly establishes probable cause for the apartment bears on the probable cause determination for the house. Ross and Falconer rely primarily on United States v. Ramos, 923 F.2d 1346 (9th Cir.1991), in which this court held there was no probable cause to search a house that a person performing "counter-surveillance driving" stopped at for twenty minutes. But in that case there was no concrete evidence of drug transactions at that house or anywhere else at the time the warrant was issued. Id. at 1349-50 (affidavit contained only circumstantial evidence such as suspicious driving, unloading of boxes). This was also the case in United States v. Huguez-Ibarra, 954 F.2d 546, 551 (9th Cir.1992) (no probable cause for search of house; house was frequently visited, sometimes by people with some connection to drugs in their pasts, but there was no direct evidence of drug activity). In this case, on the other hand, there was abundant direct evidence of drug transactions at the apartment.
 
 
 25
 Of course, there still must be some nexus between the house and the drug activity in the apartment. The affidavit's description of Ross' behavior suggests he was more than a mere neighbor or acquaintance of the occupants of the apartment: all in one morning he came out of the apartment before entering his car, exchanged keys with a person who then entered the apartment, and talked through the window with somebody in the apartment. While none of this is in itself suspicious activity, it becomes so in light of the fact that cocaine sales were being conducted openly, around the clock, at the apartment. United States v. Baron, 860 F.2d 911, 916-17 (9th Cir.1988), cert. denied, 490 U.S. 1040 (1989) (discussing when it is appropriate to presume defendant had knowledge of illicit activity). And it becomes more so in light of the affidavit's statement that Ross was a member of the Crips, and that the Crips ran the cocaine operation at the apartment. United States v. Brown, 951 F.2d 999, 1002-03 (9th Cir.1992) (discussing when membership in criminal organization supports probable cause).
 
 
 26
 Finally, Agent Veal stated that drug distribution operations often have a stash house independent of the distribution location. He stated that, based on his experience, he thought Ross' house was part of the cocaine operation. Agents' professional opinions are accorded a good deal of weight in such circumstances. United States v. Seybold, 726 F.2d 502, 504 (9th Cir.1984). This does not mean that we defer to agents' unsubstantiated or conclusory statements. However, even relatively few facts--if derived from an Agent's observations and analyzed based on his or her experience and training--may allow the Agent to make sound professional judgments that would not be apparent to the lay observer. For these reasons, Agent Veal's conclusion that Ross's house was also involved in the cocaine operation appropriately could be considered by the magistrate.
 
 
 27
 In sum, the following factors support the probable cause finding: strong evidence of drug activity in the apartment, the likelihood that Ross had been in the apartment and seen evidence of the drug sales, his membership in the same gang that ran the drug operation, his association and exchange of keys with Thigpen, who thereupon sold CI Martin cocaine, and Agent Veal's professional assessment that, based on these facts, Ross' house was likely to be involved in the drug operation. Based on these facts, we conclude that the magistrate was not clearly in error in issuing the warrant here.[3]
 
 
 28
 B. Unnecessary Pre-Arraignment Detention--Thigpen
 
 1. Legal Background
 
 29
 Thigpen contends that the district court should have suppressed his confession or dismissed the indictment against him because of unreasonable pre-arraignment delay. This issue is governed by Rule 5(a) of the Federal Rules of Criminal Procedure and 18 U.S.C. Sec. 3501.
 
 
 30
 Rule 5(a) requires that an arrested person be arraigned before a federal magistrate "without unnecessary delay." One remedy for violations of Rule 5(a) is the suppression of any confessions obtained during an unnecessarily long pre-arraignment delay. Mallory v. United States, 354 U.S. 449 (1957); McNabb v. United States, 318 U.S. 332 (1943). In Ninth Circuit cases decided under the "McNabb-Mallory rule," the crucial factor in determining whether a delay is "necessary" is "not the amount of time elapsing between arrest and confession, but rather the nature of police activities during this period." Smith v. United States, 390 F.2d 401, 403 (9th Cir.1968). Suppression is warranted
 
 
 31
 when the federal officers cannot justify their failure to promptly bring the accused before a committing magistrate, or when the federal officers delay arraignment in order to obtain evidence from the accused.
 
 
 32
 Cote v. United States, 357 F.2d 789, 794 (9th Cir.), cert. denied, 385 U.S. 883 (1966).
 
 
 33
 In 1968, Congress enacted 18 U.S.C. Sec. 3501, which deals broadly with the admissibility of confessions. The relevant sections read as follows:
 
 
 34
 (a) In any criminal prosecution brought by the United States ... a confession ... shall be admissible in evidence if it is voluntarily given....
 
 
 35
 (b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession ...[4]
 
 
 36
 (c) a [post-arrest, pre-arraignment] confession ... shall not be inadmissible solely because of delay in bringing [the suspect] before a magistrate ... if such confession is found by the trial judge to have been made voluntarily ... and if such confession was made or given by such person within six hours immediately following his arrest ...
 
 
 37
 18 U.S.C. Secs. 3501(a), (b), (c). This statutory section was enacted in part to limit the McNabb-Mallory rule, but the Ninth Circuit has not been able to determine precisely what its effect has been. United States v. Alvarez-Sanchez, 975 F.2d 1396, 1399 (9th Cir.), cert. granted, 114 S.Ct. 299 (1993).
 
 
 38
 The leading case decided under Sec. 3501, United States v. Halbert, 436 F.2d 1226 (9th Cir.1970), identified the primary conflict between Sec. 3501 and Rule 5(a): whereas the former focuses on the voluntariness of a confession, the latter is concerned with the period of pre-arraignment delay during which the confession is obtained. Halbert held that the purpose of Sec. 3501 was
 
 
 39
 to remove delay alone as a cause for rejecting admission into evidence of a confession and to make the voluntary character of the confession the real test of its admissibility.
 
 
 40
 436 F.2d at 1231. Halbert called Sec. 3501 "a scheme under which the admissibility of confessions turns upon voluntariness." Id. at 1234. As such, it significantly altered the McNabb-Mallory rule: "the admissibility of confessions should turn on voluntariness rather than whether the police conformed to established norms for their behavior." Id. at 1234. The Halbert court concluded by holding that
 
 
 41
 confessions given more than six hours after arrest during a delay in arraignment are admissible if voluntary, although the trial judge under subsection 3501(b) may take into account delay in arraignment in his determination of voluntariness.
 
 
 42
 Id. at 1237.
 
 
 43
 If delay is now no more than one of the factors which go into the voluntariness calculation, it nonetheless remains first among equals. Later cases have interpreted Sec. 3501(c) to mean that unnecessary delay alone, when it extends beyond the six-hour mark, can constitute sufficient basis for a finding of involuntariness. See Alvarez-Sanchez, 975 F.2d at 1402-04. In United States v. Wilson, 838 F.2d 1081 (9th Cir.1988), for example, this court held that defendant's confession should have been suppressed, not so much because it was in fact involuntary due to a 20-hour delay before arraignment, but more because
 
 
 44
 If we countenance the police procedure followed here, we give officers a free hand to postpone any arraignment until a confession is obtained. That was not the legislative intent behind Sec. 3501.
 
 
 45
 Id. at 1087. Thus, even when we focus on "voluntariness" under Sec. 3501, the concerns with police behavior codified in Rule 5(a) still play a vital role.
 
 
 46
 Although it is unclear to what extent Sec. 3501 limits or modifies the McNabb-Mallory rule, and to what degree voluntariness has replaced pre-arraignment delay as the touchstone of the confession-suppression analysis, Alvarez-Sanchez, 975 F.2d at 1404, some solid ground can nonetheless be found. First, a pre-arraignment delay of more than six hours does not automatically require suppression of a confession given during the pre-arraignment period. And second, whether suppression is warranted depends in part on the likelihood that the delay beyond six hours resulted in a coerced or involuntary confession, and in part on the degree to which the delay appears to have been the result of inappropriate police behavior.
 
 2. Application to Thigpen's Detention
 
 47
 Thigpen argues that his confession was not voluntary. His discussion of the factors listed in Sec. 3501(b), however, is misleading. Although he was informed of his Miranda rights before giving his confession, he argues that his earlier, non-Mirandized questioning somehow tainted the confession. LAPD detective Caballero's affidavit, however, indicates that the earlier questioning had nothing to do with his current drug-related arrest, and indeed that Thigpen professed to know nothing about the assault on the paramedics, the subject of the earlier questioning. Thigpen does not allege that anything he said that morning incriminated him, and he makes no plausible argument that his later confession was somehow the "tainted fruit" of the earlier questioning. In cases in which an earlier separate interrogation has been held to have an effect on the voluntariness of a later confession, both interrogations were about the same crime. Wilson, 838 F.2d at 1083; United States v. Fouche, 776 F.2d 1398, 1401-02, 1407 (9th Cir.1985).
 
 
 48
 Second, Thigpen contends he did not know the "nature of the offense with which he was charged or ... suspected of," 18 U.S.C. Sec. 3501(b)(2), because, although aware of the possible drug charges he was not aware that a firearm possession charge might also be brought. This argument, which would only establish a partial ignorance in any case, is not plausible. Martin claimed to have purchased cocaine from Thigpen and Ross when a gun was in plain view. The numerous guns recovered from both the house and the apartment indicate that guns were a part of the operation in which Thigpen participated. A firearm possession charge, in this situation, was hardly unforeseeable.
 
 
 49
 The factor which weighs most in Thigpen's favor is the delay between his arrest and arraignment--a total of more than 48 hours. His confession, however, came only two and one-half hours after the six-hour "safe harbor" established under the statute. The time he spent in custody post-confession and pre-arraignment is not relevant to the voluntariness of his confession. Halbert, 436 F.2d at 1237 ("the delay after the confession and before his federal arraignment obviously had no effect on the prior confession and would not render it inadmissible"). The two and one-half extra hours, while a factor weighing in favor of finding an involuntary confession, is a weak one in the absence of evidence that he was somehow "worn down" or otherwise intimidated during this period. E.g., Wilson, 838 F.2d at 1086 (interrogator used skillful psychological techniques on defendant); Fouche, 776 F.2d at 1407 (defendant questioned in oppressive environment of police car).
 
 
 50
 Thigpen does not allege that he was intimidated or coerced to confess, and the record does not give rise to any suspicion on that account. In the absence of such allegations, and because the statutory factors listed in Sec. 3501(b) weigh in favor of it, we find that the district court did not err in finding the confession voluntary.
 
 
 51
 Nor do we find the delay preceding Thigpen's confession unnecessary or unreasonable. In this regard, the central issue is whether "the primary purpose in detaining the appellant was to allow federal officers to interrogate him." Cote, 357 F.2d at 793-94. In Wilson, this court suppressed a confession because, among other things, arraignment was delayed so that federal officers could complete an interrogation, despite the fact that a magistrate was available in the same building to conduct the arraignment. 838 F.2d at 1085; see Alvarez-Sanchez, 975 F.2d at 1405 (delay was for "sole purpose of interrogating the arrestee"). Moreover, the United States Supreme Court, in examining pre-arraignment delay under the Fourth Amendment, has said
 
 
 52
 Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake.
 
 
 53
 County of Riverside v. McLaughlin, 111 S.Ct. 1661, 1670 (1991).[5]
 
 
 54
 Here, however, the government argues that Thigpen's arraignment was delayed because of the time it took to search the two properties and to process the evidence recovered from them. The government claims that by the time Thigpen was transferred to ATF custody, the magistrate was no longer available to perform arraignments. It does not appear from the record that the ATF agents had any ulterior motive in waiting until 5:30 p.m. to question Thigpen. Delays for appropriate reasons should not be held unnecessary or unreasonable. E.g., 18 U.S.C. Sec. 3501(c) (six-hour period will be extended if travel difficulties exist); United States v. Manuel, 706 F.2d 908, 914 (9th Cir.1983) (overnight delay not unreasonable where suspect was drunk upon arrest and was allowed to sleep and eat before being questioned).
 
 
 55
 Thigpen, unlike those defendants who have successfully moved to suppress confessions due to delay, has shown neither that the eight and one-half hours prior to his confession was a delay designed to elicit the confession (or to accomplish any other improper motive), nor that the eight and one-half hours in any way affected the actual voluntariness of his confession.
 
 
 56
 Thigpen was kept in federal custody for more than 40 hours after his confession before being arraigned. While this period had no effect on the voluntariness of a confession already given, it certainly relates to the other interests enshrined in Sec. 3501 and Rule 5(a)--specifically judicial supervision from the earliest possible point in a criminal proceeding. In this regard, suppression of a confession can be a prophylactic measure designed to be a disincentive for unnecessary police delay in bringing a suspect to arraignment.
 
 
 57
 Because we find no evidence of purposeful police misconduct in causing the delay, however, suppression would be an unnecessarily harsh penalty for a delay which cannot fairly be called prejudicial to the defendant. A similar conclusion applies to Thigpen's argument that his indictment should be dismissed on account of the delay. In the one case he cites dealing with police delay, United States v. Jernigan, 582 F.2d 1211 (9th Cir.), cert. denied, 439 U.S. 991 (1978), the court found that the arresting officer had waited to arrest a suspect specifically so that the defendant would have to spend a long weekend in jail. Nonetheless, the Ninth Circuit only issued a warning, however, suggesting that repetition might lead to dismissal of indictments in future. Id. at 1214. In Thigpen's case, we find no evidence of deliberate misconduct.
 
 II. Sufficiency of the Evidence
 A. 18 U.S.C. Sec. 924(c) Conviction--Ross
 
 58
 Ross was convicted on Count 5 of the indictment: use of eight firearms during and in relation to the drug trafficking crimes. Two of those guns were found downstairs in his house, and the other six were found in the attic crawl space. One of those six qualified as a "short-barreled shotgun," which increased his mandatory sentence from five to ten years. 18 U.S.C. Sec. 924(c)(1). He argues on appeal that the evidence was insufficient to prove that the six attic guns were used in relation to the cocaine offenses of which he was convicted, and thus that his sentence under Sec. 924(c) should be reduced from ten to five years.
 
 
 59
 There is sufficient evidence to support a conviction if, " 'reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original)). The essential elements of a Sec. 924(c) violation are that the defendant (1) knowingly used or carried a firearm (2) during and in relation to a drug trafficking crime. United States v. Martinez, 967 F.2d 1343, 1346 (9th Cir.1992). The second requirement exists because "Congress did not intend to penalize one who happens to have a gun in his possession when he commits an entirely unrelated offense." United States v. Moore, 580 F.2d 360, 362 (9th Cir.), cert. denied, 439 U.S. 970 (1978).
 
 
 60
 The short-barreled shotgun and five other guns were found in an attic which could be reached only through an opening in the kitchen ceiling. Ross cites Agent Smith's testimony that he tried twice unsuccessfully to get up into the attic--once by lifting another agent on his shoulders, and once by standing on a chair. Only on the third try did Agent Smith manage to lift a second agent up far enough to reach into the attic and extract the guns. Ross argues that because the guns were not "readily available," they could not possibly have been used during and in relation to the cocaine offenses. Ross's Opening Brief at 21.
 
 
 61
 We have previously rejected this argument: "[w]hile we agree that the firearm must be available, we reject the notion that it must be readily available." United States v. Torres-Medina, 935 F.2d 1047, 1049 (9th Cir.1991). In Torres-Medina, the court upheld a Sec. 924(c) conviction where a handgun and cocaine were found together in a crawl space underneath defendant's house. Although defendant was a paraplegic and could not himself enter the crawl space, the court reasoned that one of his accomplices (who had admitted helping him in other respects) could remove the gun and the drugs for him. Since the gun was thus "producible at his beck and call," even if not readily or quickly available, it "emboldened him in the commission of his crime." Id. at 1050 (basing holding on United States v. Stewart, 779 F.2d 538, 540 (9th Cir.1985)).
 
 
 62
 Here, the guns were in a crawl space above, not below, the main level--but that is hardly a relevant difference. Perhaps Ross, like Torres-Medina, could not reach the guns alone; but as in Torres-Medina, he had accomplices who could have helped him (Falconer, in fact, was arrested with him in the house). Torres-Medina suggests that the fact that the guns were not "readily available" to Ross does not at all foreclose a factual finding that they "emboldened him in the commission of his crime."
 
 
 63
 The only important difference between Ross's case and Torres-Medina is that there the drugs and gun were in the same spot, whereas here the drugs were in a bedroom closet. There is no requirement, however, that the guns and drugs be in the same room, or even in the same house. E.g., United States v. Torres-Rodriguez, 930 F.2d 1375, 1385-86 (9th Cir.1991) (.357 Magnum found under mattress in bedroom; heroin found elsewhere in house); Stewart, 779 F.2d at 539 (UZI rifle in trunk of car; defendant in front seat; car parked in front of house; drugs in house).
 
 
 64
 Ross has produced no evidence of an alternative use for the guns. Defendant Falconer's confession suggests that some of their customers "pawned" guns for cocaine; the guns might have been acquired in that way. Under United States v. Phelps, 877 F.2d 28 (9th Cir.1989), bartering a gun for drugs was held to fall outside the statutory definition of using it during and in relation to a drug offense. In Smith v. United States, 113 S.Ct. 2050 (1993), however, the Supreme Court foreclosed this argument by holding that bartering a firearm for drugs did indeed constitute a Sec. 924(c) violation. Id. at 2058-59.
 
 
 65
 In conclusion, there was sufficient evidence from which the jury could have concluded that Ross used the attic guns in connection with his drug trafficking activities. We therefore affirm his conviction.[6]
 
 
 66
 B. Possession of Cocaine and Cocaine Base with Intent to Distribute Convictions--Falconer
 
 
 67
 Falconer argues that there was insufficient evidence to support his convictions on Counts Two and Three of the Indictment, possession of cocaine base and cocaine with intent to distribute. There is sufficient evidence to support a conviction if, " 'reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original)).
 
 
 68
 The essential elements of a possession charge depend on the theory of possession employed. In the Ninth Circuit,
 
 
 69
 A conviction for possession with intent to distribute narcotics may be based on one of three legal theories: (1) co-conspirator liability, United States v. Pinkerton, 328 U.S. 640, 645-47 [ ] (1946), (2) aiding and abetting, United States v. Savinovich, 845 F.2d 834, 838 (9th Cir.), cert. denied, 488 U.S. 943 [ ] (1988), and (3) exercising dominion and control over the contraband. United States v. Behanna, 814 F.2d 1318, 1319 (9th Cir.1987).
 
 
 70
 United States v. Sanchez-Mata, 925 F.2d 1166, 1168 (9th Cir.1991). In Falconer's case, the government relied primarily on co-conspirator liability. Under that theory,
 
 
 71
 A party to an unlawful conspiracy may be held responsible for substantive offenses committed by his co-conspirators in furtherance of the unlawful project, even if the party himself did not participate directly in the commission of the substantive offense.
 
 
 72
 United States v. Crespo de Llano, 838 F.2d 1006, 1019 (9th Cir.1987). However, the substantive offense committed by a co-conspirator in furtherance of the conspiracy must have been reasonably foreseeable to defendant. United States v. Aichele, 941 F.2d 761, 764 (9th Cir.1991); United States v. Garcia, 909 F.2d 1346, 1350 n. 1 (9th Cir.1990).
 
 
 73
 The government also argued that Falconer had "constructive" dominion and control (hence possession) over the cocaine and cocaine base. See United States v. Restrepo, 930 F.2d 705, 709 (9th Cir.1991).
 
 
 74
 Constructive possession may be shown by proof that the defendant had an ability to produce the drug through the use of agents.... [or] that the defendant participated in a joint venture, and thus shared dominion and control over the contraband.
 
 
 75
 Id. at 709-710 (citations omitted).
 
 
 76
 Regarding the cocaine found on August 5 in the apartment at 209 East 62nd Street, Falconer argues that he had not been in the apartment since July 29. He contends that the government has failed to prove that the cocaine found in the apartment on August 5 was the same batch from which Falconer sold CI Martin $100 worth. He concludes that there is no evidence that he had dominion and control over the cocaine seized on August 5.
 
 
 77
 However, the government proved at trial that Falconer took part in a cocaine distribution conspiracy with Ross and Thigpen, and Falconer does not appeal his conspiracy conviction. One undisputed element of the conspiracy was to "cook," bag, and sell cocaine from the apartment--that much can be gleaned from Falconer's signed statement alone. The cocaine recovered in the apartment consisted of (1) a flower pot bowl containing packages wrapped for sale, (2) a dish of rock cocaine (with a razor blade) on the kitchen table, and (3) a vial of crack cocaine also on the kitchen table. CI Martin specifically reported that Falconer had sold her a $100 bag of cocaine from the flower pot bowl. Falconer's statement mentions that the conspirators kept "cut up" cocaine on "the table" for sale in small amounts.
 
 
 78
 The government's failure to prove Falconer had been in the apartment since July 29 is thus irrelevant. There is no question that Falconer knew or should have known that his co-conspirators would continue selling cocaine there in his absence--that was the purpose of the conspiracy. His possession with intent to distribute conviction for the cocaine found at the apartment (Count 2) must therefore be affirmed.
 
 
 79
 A similar result obtains with respect to Falconer's possession of the 1,971 grams of cocaine found in a locked closet at Ross's house (Count 3). The relevant inquiry is whether a co-conspirator's possession of a large amount of cocaine at a stash house was reasonably foreseeable under the circumstances. We think it was. Indeed, Falconer's own statement indicates that "Cass" regularly purchased much more cocaine than was found at the apartment; it is a reasonable inference that the excess was being cached somewhere nearby. Moreover, because the inquiry goes to foreseeability rather than actual knowledge, Ross' statements that he was keeping the cocaine for "Juan," and that nobody else knew about it, are not dispositive here. Finally, the cases Falconer cites in support of his position are not on point because the defendants there were not convicted on conspiracy charges. See United States v. Ocampo, 937 F.2d 485 (9th Cir.1991); United States v. Ramirez, 880 F.2d 236 (9th Cir.1989). We find that the evidence was sufficient to support a jury finding that Falconer knew or reasonably should have known that Ross was keeping the cocaine in his house. We therefore affirm Falconer's conviction.
 
 III. Sentencing Issues
 A. Downward Departure--Thigpen
 
 80
 Thigpen appeals the district court's failure to depart downward on the grounds that his classification as a career offender significantly overstates his criminal history. A district court's discretionary decision not to depart downward is not reviewable. United States v. Reyes-Alvarado, 963 F.2d 1184, 1189 (9th Cir.), cert. denied, 113 S.Ct. 258 (1992). If, however, the district court was under the impression that it was as a matter of law without authority to depart downward, and if it expressed a desire to depart downward in the case before it, we will review de novo its determination that it had no authority to depart. United States v. Brown, 985 F.2d 478, 480 (9th Cir.1993).
 
 
 81
 Thigpen argues that the district court was under the impression that it had no authority to depart downward if it thought his career offender status overstated his criminal history. See U.S.S.G. Sec. 4A1.3 (departure appropriate where "defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit future crimes"). A review of the record, however, shows this is not true.
 
 
 82
 Thigpen's codefendant Falconer thoroughly briefed the Sec. 4A1.3 departure for the district court, and Thigpen made a corresponding oral argument at sentencing. In summarizing its decision not to depart, the court said,
 
 
 83
 I have read the cases that [Falconer's brief] presented to me and I can't say that those cases are helpful to the defendants. The facts in those cases are clearly distinguishable. The cases speak of the proximity in time of the offenses, the sentence imposed ... the fact that there was no antisocial quality to the defendant or the offenses, and in one instance some prognostication by a psychiatrist that recidivism was unlikely. Hardly a prognostication that could be being taken seriously here.
 
 
 84
 Transcript of Sentencing Hearing, January 11, 1993, at 27-28. The court concluded,
 
 
 85
 I wish it were otherwise, but the fact is that [defendants] do legitimately come within the category of career offenders and the cases don't, the facts here don't justify a departure.
 
 
 86
 Id. at 29.
 
 
 87
 Thigpen cites one statement of the district court in support of his contention that the court thought it had no authority to depart downward:
 
 
 88
 Furthermore, in this offense there was evidence of some arsenal of weaponry and it doesn't seem to me that I have discretion. In a way I wish I had, but I think I would be violating the law if I downwardly departed on these facts. It distresses me, but that is the unfortunate conclusion.
 
 
 89
 Id. at 28. Read in context, however, this statement expresses the district court conviction that prior caselaw would not justify a departure "on these facts." The statement immediately follows a paragraph in which the district court distinguishes the other cases on downward departure where a criminal history category over-represents a defendant's real criminal history. We read the district court's statement that "it doesn't seem to me that I have discretion" to mean, "it would be an abuse of discretion for me to depart downward on these facts."
 
 
 90
 In sum, the district court understood that downward departure was available where a defendant's prior convictions were close in time (thus indicating no criminal "career" is involved), where defendant was young at the time of the priors, where the crime was not "antisocial," or where there was a low risk of recidivism. The district court also decided these mitigating factors did not appear in Thigpen's case. Because the district court's decision not to depart downward was therefore an unreviewable exercise of discretion, we affirm Thigpen's sentence.
 
 B. Minor Participant Status--Falconer
 
 91
 Under the Sentencing Guidelines, the sentencing court must grant a two-level reduction if the defendant was a "minor participant" in the crimes charged. U.S.S.G. Sec. 3B1.2(b). A minor participant is one who is "less culpable than most other participants," id. at note 3, or "substantially less culpable than the average participant." Id. at bkgd. note; see United States v. Andrus, 925 F.2d 335, 338 (9th Cir.), cert. denied, 112 S.Ct. 249 (1991) ("merely being less culpable than one's co-participants does not automatically result in minor status"); United States v. Thomas, 932 F.2d 1085, 1092 (5th Cir.) (defendant must "do enough less so that he at best was peripheral to the advancement of the illicit activity"), cert. denied, 112 S.Ct. 887 (1991). A district court's finding that defendant was not a minor participant is reviewed for clear error. United States v. Peters, 962 F.2d 1410, 1414 (9th Cir.1992).
 
 
 92
 Ross, Falconer, and Thigpen were sentenced together. Falconer requested a downward adjustment for being a minor participant, and the court appeared to consider the relative culpability of the three defendants. Transcript of Sentencing Hearing, January 11, 1993, at 5, 12-13, 18. The court did not make a minor participant reduction in Falconer's case, although it never explicitly denied the request or made findings concerning his level of culpability.
 
 
 93
 Falconer was convicted with Ross and Thigpen on the theory that all three sold cocaine for Dennis Cooper, aka "Cass" or "Casper." Falconer argues that his participation was minor in relation to Ross and Thigpen, in that he sold cocaine to CI Martin on only one occasion, almost a week before the arrests were made. As the government points out however, Ross and Thigpen also sold cocaine to Martin only once. Moreover, after being arrested Falconer signed a written statement which indicates a high level of participation in the conspiracy. He states that "I sell for 'Cass', about three or four thousand dollars a day." He describes several aspects of the operation, such as Cass' source, the way the cocaine is bagged, the use of a triple-beam scale, and the fact that Cass "cooks" the cocaine at 209 East 62nd Street. In several places he uses the word "we," as in "we keep cut up cocaine on the table that we sell for 5-10-20 dollars."
 
 
 94
 Given these facts, it is not possible to say that Falconer is substantially less culpable than the other participants in the conspiracy. He, along with Ross and Thigpen, is probably less culpable than Cass, but Cass is not a defendant in this case--and if he were the charges would no doubt be even more serious. We affirm Falconer's sentence.
 
 
 95
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Agent Merenyi, who was on surveillance at the time, thought the person was Dennis Cooper, and that is what Agent Veal reported in his affidavit. Cooper was a suspected gang member and had a previous felony conviction. At trial, however, Agent Burford (on surveillance with Merenyi) identified Darcy Thigpen as the man who exchanged keys with Ross
 
 
 [2]
 The relevant prior offenses were a robbery conviction on August 24, 1986 (for which he received a two-year sentence), and a conviction for possession of marijuana for sale on June 19, 1991 (for which he received a 16-month sentence)
 
 
 [3]
 Even if he were, however, in this case the "good faith" exception to the exclusionary rule would apply. See United States v. Leon, 468 U.S. 897 (1984). Under this exception, evidence seized pursuant to good-faith reliance on a facially valid warrant will not be suppressed unless "the affidavit was so deficient ... that 'any official belief in the existence of probable cause must be considered unreasonable.' " Ramos, 923 F.2d at 1354 (quoting United States v. Hove, 848 F.2d 137, 139 (9th Cir.1988)). In both Ramos and Brown, this court found that warrants were not supported by probable cause, but nonetheless held that the evidence should not be suppressed because the affidavits contained information that made the officers' reliance on the warrants reasonable--even if it was not sufficient to support probable cause. 923 F.2d at 1354; 951 F.2d 1004-05. In Hove and United States v. Holzman, 871 F.2d 1496 (9th Cir.1989), by way of contrast, the good faith exception did not apply where there was absolutely no information in the affidavit linking the place to be searched (Hove ) or the thing to be searched for (Holzman ) to any suspect or any suspected criminal activity. The present case is much more like Ramos and Brown
 
 
 [4]
 Section (b) lists some such factors, such as the time between arrest and arraignment, whether defendant knew what he was charged with, whether defendant had been advised of the right to remain silent and to have an attorney, and whether an attorney was actually present
 
 
 [5]
 McLaughlin held that an individual arrested without probable cause must be brought before a judicial official within 48 hours to receive a probable cause determination. The Court's opinion does not mention Rule 5(a) or Sec. 3501. In any case, ATF did secure a probable cause determination from a magistrate about 35 hours after Thigpen's arrest
 
 
 [6]
 Ross's reliance on United States v. Feliz-Cordero, 859 F.2d 250 (2d Cir.1988) is doomed to fail because that case is flatly inconsistent with Ninth Circuit law. In Martinez, this court rejected a similar citation to Feliz-Cordero: "we are obliged to follow the law of our circuit over inconsistent law from other circuits." 967 F.2d at 1347