**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**George Michael SHIPSEY,**
**Defendant–Appellant.**

No. 02–10651.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 8, 2004.

Filed April 9, 2004.

As Amended May 12, 2004.

Dennis P. Riordan, Riordan & Horgan, San Francisco, CA, for the defendant-appellant.

Lawrence J. Leigh, Assistant United States Attorney, San Francisco, CA, for the plaintiff-appellee.

Before: HALL and GRABER, Circuit Judges, and WEINER, Senior District Judge.*

WEINER, Senior District Judge:

## I.

George Michael Shipsey appeals his conviction on charges of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and theft from an employee pension fund (18 U.S.C. § 664), arising from the diversion of construction loan proceeds. Previously, another panel of this court had vacated his

---

* Honorable Charles R. Weiner, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

first conviction on these charges, *United States v. Shipsey*, 190 F.3d 1081 (9th Cir. 1999) ("*Shipsey I*"), and remanded for a new trial. The district court had jurisdiction pursuant to 28 U.S.C. § 1331; this court has jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the convictions.

## II.

Shipsey was originally indicted on December 31, 1993. Counts 1 through 9 charged mail fraud; counts 10 through 13 charged wire fraud; counts 14 through 20 charged theft from an employee pension plan; and counts 21 through 24 charged money laundering (18 U.S.C. § 1957). His first trial commenced on May 20, 1997. Counts 21 and 22 were dismissed by the district court at the end of the government's case-in-chief. The jury deadlocked on counts 1 through 13; it found Shipsey guilty on counts 14 through 20 and 23 through 24. The district court declared a mistrial on the deadlocked counts and Shipsey was sentenced to 37 months' imprisonment. He remained free on bond pending appeal.

On remand, following the decision in *Shipsey I*, the district court dismissed counts 1 through 13 of the original indictment without prejudice, due to a Speedy Trial Act violation. A superseding indictment recharged the first eight of the nine dismissed mail fraud counts, all of the wire fraud counts (superseding counts 9 through 12), and the other counts that had not been previously dismissed with prejudice (superseding theft counts 13 through 19; superseding money laundering counts 20 through 21). On February 14, 2001, the district court granted in part and denied in part Shipsey's motion to dismiss; it dismissed superseding theft counts 17, 18 and 19 and superseding money laundering counts 20 and 21, for failure to state an offense.[1] It denied the motion as to the remaining counts, rejecting Shipsey's argument that the superseding counts were barred by the statute of limitations.

Shipsey's retrial resulted in a conviction on all of the undismissed superseding counts (1 through 16). He was sentenced to 30 months' imprisonment on each count, to run concurrently. He remains free on bond pending appeal.

## III.

Shipsey is a land developer and building contractor. He was one of three general partners in Michael Shipsey and Associates ("the partnership").[2] In 1988, the partnership began developing a project called Stonefield at Fountaingrove in Santa Rosa, California ("Stonefield"). Shipsey was hired by the partnership to be general contractor on the project. He received a fee for his services of 5% of the total construction cost. At the same time, Shipsey was building his own palatial residence on Obertz Lane in Novato, California ("Obertz"). Basically, the crimes charged in this case arose from Shipsey's using money loaned to the partnership to build Stonefield to pay unpaid debts to subcontractors for the construction of the Obertz mansion.

Shipsey sought financing for Stonefield from McMorgan & Co. McMorgan acted as investment manager for several union pension funds, including four at issue here,

---

1. Counts 17–19 were dismissed because, although they alleged a violation of 18 U.S.C. § 664, theft from an employee pension plan, no pension plan was named in the counts, only First California Mortgage Company ("First Cal"). Counts 20–21 were likewise dismissed because although they alleged violations of 18 U.S.C. § 1957, laundering of money obtained in violation of § 664, they also named no pension plan, only First Cal.

2. The other two partners withdrew from the partnership and the project when it was less than one-half complete.

those of the Carpenters, Operating Engineers, Plasterers, and Sheet Metal Workers unions (collectively "the Pension Funds"). Shipsey met with McMorgan's vice-president, Michael Fry. Through Fry, the government established Shipsey's knowledge that the lenders on the project would be union pension trust funds. Fry committed the Pension Funds to a $19 million loan to fund the Stonefield project.

Rather than drawing loan proceeds directly from the Pension Funds, the partnership signed its loan agreement with First Cal, a company associated with McMorgan. First Cal then sold the note to the Pension Funds, pursuant to a previously executed agreement. The construction loan agreement that Shipsey signed specifically provided that First Cal would sell the indebtedness to ERISA governed pension funds. First Cal serviced the loans. It made disbursements to the partnership out of its own funds, via a line of credit it maintained at American Security Bank. First Cal was then reimbursed from the Pension Funds, subject to McMorgan's approval.

To obtain draws on the loan, Shipsey was required to submit draw requests as it received bills from subcontractors and suppliers. Another company employed by First Cal, Project Control, prepared reports on the progress of the project and reviewed the draw requests. First Cal and McMorgan also had to review and approve the draw requests. Once McMorgan gave the final okay, First Cal issued loan proceeds in the form of two-party checks, made payable to both the partnership and the subcontractor or supplier. First Cal then submitted its requests for reimbursement to McMorgan, which authorized wire payment transfers from the pension funds to First Cal's account at American Security Bank.

Trial evidence demonstrated that portions of the loan advances were diverted from the Stonefield project to pay bills incurred by Shipsey in building the Obertz residence. Several subcontractors on the Stonefield project also worked at Obertz. Shipsey directed his office staff to include Obertz invoices in the Stonefield draw requests. In addition, Shipsey made agreements with subcontractors who were owed money on Obertz to increase the prices invoiced on Stonefield work—and paid from the loan proceeds—thereby folding the Obertz debts into the cost of building Stonefield. Within months of the start of construction at Stonefield, First Cal expressed concerns over cost overruns. By April 1989, it determined that the amount of the remaining loan funds would be insufficient to complete construction. In December 1989, it declared the loan in default. Nonetheless, it continued funding draw requests until at least March 1990. By July 1990, all funding and construction ceased and the pension funds began foreclosure.

## IV.

Shipsey first argues the district court erred by rejecting his proposed jury instruction on good faith as a defense to the fraud charges.[3] His instruction would have charged the jury that: (1) the government had the duty to prove the intent element of the mail fraud, wire fraud and theft from an employee benefit plan

---

3. We review de novo whether the district court's instructions adequately presented the defendant's theory of the case. *United States v. Smith,* 217 F.3d 746, 750 (9th Cir.2000). The court's "precise formulation" of the instructions is reviewed, however, for an abuse of discretion. *United States v. Dixon,* 201 F.3d 1223, 1230 (9th Cir.2000). Whether a jury instruction misstates elements of the crime is a question of law reviewed de novo. *United States v. Knapp,* 120 F.3d 928, 930 (9th Cir.1997).

charges beyond a reasonable doubt; (2) good faith was a complete defense to these charges because good faith is inconsistent with an intent to defraud; and (3) the government had to disprove good faith in order to establish intent. Rather than give the defendant's proffered instructions, the district court charged the jury on good faith as part of its charge on the element of intent to commit each offense. Regarding mail fraud, it charged in pertinent part that

> an attempt to defraud is an attempt to deceive or cheat. In determining whether or not the defendant acted with an intent to defraud, you may consider whether or not the defendant had a good-faith belief in the truthfulness of representations made by him or a good-faith belief that the disbursements were authorized.

The district court gave an almost identical charge for the wire fraud counts. As regards the theft from pension plan charges, the court charged:

> In determining whether or not defendant acted with an intent to defraud in causing a disbursement of monies by an employee benefit plan, you may consider whether or not the defendant had a good-faith belief in the truthfulness of the representations made by him or a good-faith belief that the disbursements were authorized.

Shipsey takes issue with the trial court's failure to specifically instruct that the government had the burden to disprove good faith, and that a finding Shipsey did act under a good faith belief would preclude a finding of specific intent. This argument is unsupportable for several reasons. First, the district court's charge clearly included the requirement that the government had the burden to prove each element, including the element of intent, beyond a reasonable doubt. Second, the court correctly instructed the jury on the

definition of intent, i.e., an intent to deceive or cheat. Third, the court did, in fact, charge that a good faith belief in the truthfulness of representations made could be considered in determining intent.

■ Our case law is well settled that a criminal defendant has "no right" to *any* good faith instruction when the jury has been adequately instructed with regard to the intent required to be found guilty of the crime charged, notwithstanding the normal rules governing "theory of defense" requests. *See, e.g., United States v. Frega,* 179 F.3d 793, 804 (9th Cir.1999) (where district court provided adequate instruction on specific intent element of mail fraud, instruction that "good faith was a complete defense" was not required); *United States v. Dees,* 34 F.3d 838, 842 (9th Cir.1994) (specific good faith instruction is unnecessary where the court has already adequately instructed the jury as to specific intent). We have held:

> Notwithstanding the normal rules governing "theory of defense" requests, the Ninth Circuit has held that "the failure to give an instruction on a 'good faith' defense is not fatal so long as the court clearly instructed the jury as to the necessity of 'specific intent' as an element of a crime."

*United States v. Sarno,* 73 F.3d 1470, 1487 (9th Cir.1995) (quoting *United States v. Solomon,* 825 F.2d 1292, 1297 (9th Cir. 1987)); *see also United States v. Dorotich,* 900 F.2d 192, 193–94 (9th Cir.1990).

There can be little doubt that the court correctly defined intent. Its charge—that intent to defraud is an intent to deceive or cheat—comes directly from Ninth Circuit Model Criminal Jury Instructions § 3.17. Indeed, Shipsey does not appear to argue that the intent definition was erroneous. As the district court defined intent to defraud, no good faith instruction was necessary at all, and certainly

not the defendant's specific instruction. Where the instruction actually given was legally sufficient, a defendant cannot successfully contend that declining to use his specific formulation was an abuse of discretion.

## V.

▇▇▇ Shipsey next argues the district court erred when it reinstated charges that had been previously dismissed under the Speedy Trial Act, because he was not reindicted on the charges until long after the five-year statute of limitations had run.[4] The statute of limitations applicable to the crimes charged in this indictment is the five-year statute for non-capital offenses, 18 U.S.C. § 3282.[5] The statute of limitations must be read in conjunction with 18 U.S.C. § 3288, which provides a six-month grace period in situations where an indictment is dismissed after the statute of limitations expires. The current version of the statute provides in pertinent part:

> Whenever an indictment or information charging a felony is dismissed for any reason after the period prescribed by the applicable statute of limitations has expired, a new indictment may be returned in the appropriate jurisdiction within six calendar months of the date of the dismissal of the indictment or information.... This section does not permit the filing of a new indictment or information where the reason for the dismissal was the failure to file the indictment or information within the period prescribed by the applicable statute of limi-

tations, or some other reason that would bar a new prosecution.

18 U.S.C. § 3288.

Shipsey, indisputably, was originally indicted within the five-year statute of limitations. The original indictment containing those counts was, however, dismissed on speedy trial grounds, without prejudice, by the district court on October 24, 2000, after the return of the mandate from the first appeal. The superseding indictment was returned on November 6, 2000—beyond the expiration of the statute of limitations, but within the six-month grace period provided by the current version of § 3288. The issue presented then, is whether the current version of the savings clause is applicable to a without-prejudice dismissal due to a speedy trial violation.

Citing our holding in *United States v. Peloquin*, 810 F.2d 911 (9th Cir.1987) (indictment dismissed for Speedy Trial Act violation is not "defective or insufficient"; savings clause of 18 U.S.C. § 3288 (superseded) therefore does not apply), Shipsey argues that the district court erred when it permitted the government to file a superseding indictment, recharging the mail and wire fraud counts that had been the subject of a mistrial due to a hung jury. Because we conclude that the amendment to § 3288 statutorily overruled our holding in *Peloquin*, we reject Shipsey's argument. We begin our analysis with the district court's speedy trial rulings.

The Speedy Trial Act's sanction provision at issue here is 18 U.S.C. § 3162(a)(2), which provides in pertinent part:

---

**4.** The district court's conclusion that a particular statute of limitations applies is reviewed de novo. *United States v. Workinger*, 90 F.3d 1409, 1412 (9th Cir.1996); *United States v. Manning*, 56 F.3d 1188, 1195 (9th Cir.1995). The construction or interpretation of a statute is reviewed de novo. *United States v. Pluff*, 253 F.3d 490, 492 (9th Cir.2001).

**5.** The section provides: "Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." 18 U.S.C. § 3282(a).

If a defendant is not brought to trial within the time limit required by section 3161(c) [70 days] as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant.... In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice.

The district court's October 24, 2000, order cited the statute and considered the pertinent factors. It found that more than 70 non-excludable days elapsed from the date the court declared a mistrial on the deadlocked mail fraud and wire fraud counts. Accordingly it conducted a prejudice analysis, finding (1) the seriousness factor did not clearly weigh in either party's favor; (2) the facts and circumstances weighed in the government's favor (the delay was caused by the first appeal, Shipsey was not in custody, evidence was preserved in the first trial's transcripts, any onus Shipsey suffered from the pending counts was no greater than that which he suffered from the counts of conviction that were appealed); and (3) the effect on administration of justice and the Speedy Trial Act also weighed in the government's favor because this was not a case where the time limits were routinely disregarded, rather the delay was caused primarily by the appeal. The district court accordingly concluded that the dismissal should be without prejudice.

## A. Section 3288's Amendment and our prior precedents.

The current version of § 3288 was enacted by Congress as part of the Anti-Drug Abuse Act of 1988, Pub.L. No. 100–690, § 7081(a), 102 Stat. (1988 U.S.C.C.A.N.) 4181, 4407. Prior to the amendment the statute provided a different standard for when the savings clause applied. The prior version provided in pertinent part:

Whenever an indictment ... is found ... defective or insufficient for any cause, after the period prescribed by the applicable statute of limitations has expired, a new indictment may be returned ... within six calendar months of the date of the dismissal....

18 U.S.C. § 3288 (superseded). The amended version eliminated the "defective or insufficient" phrasing, substituting instead that when an indictment is "dismissed for any reason," it may be reinstated so long as the original was not dismissed because of a failure to file it within the statute of limitations, or "some other reason that would bar a new prosecution."

Our decision in *Peloquin* construed the now superseded statute. As here, the district court had dismissed an indictment without prejudice, due to a Speedy Trial Act violation. Also as here, the government reindicted the defendant after the statute of limitations had expired, but within the six-month grace period. We determined that an indictment dismissed for a Speedy Trial Act violation is not "insufficient[or] defective, either by its own terms or with reference to the grand jury proceedings. It was simply out of time, and that does not suffice for the government to invoke the six months savings period of section 3288." *Id.,* 810 F.2d at 913.

*Peloquin* relied in great part on the seminal decision in *United States v. Strewl,* 99 F.2d 474 (2d Cir.1938), and our own decision in *United States v. Charnay,* 537 F.2d 341 (9th Cir.1976). In *Strewl,* Judge Learned Hand had first set out the prevailing law on the statute. In *Charnay,* we approved the application of the

savings clause where the original indictment did not state facts sufficient to constitute a crime. *Charnay* distinguished two district court decisions which had concluded dismissal of an indictment for failure to prosecute did not trigger § 3288, *United States v. Moriarty*, 327 F.Supp. 1045 (E.D.Wis.1971), and *United States v. DiStefano*, 347 F.Supp. 442 (S.D.N.Y. 1972), noting that a Speedy Trial Act violation was not a defect with the indictment itself. *Charnay*, 537 F.2d at 355. In *Peloquin*, we concluded that where an indictment is not itself defective, extending the statute of limitations would not further Congress's goal in enacting § 3288,

> which is to discourage defendants from delaying their motions to dismiss until after the statute of limitations has run. Unlike the defendant in *Charnay*, this defendant could not have made his motion until after the five years had run. Refusing to apply section 3288 to Speedy Trial Act dismissals does not further manipulation by a defendant.

*Peloquin*, 810 F.2d at 912–13.

Congress amended § 3288 within one year of our decision in *Peloquin*. It specifically deleted the more narrow "defective or insufficient" wording on which we had relied in our decision, broadening the text to arguably include dismissals for Speedy Trial Act violations.[6] *Peloquin* turned on the fact that a Speedy Trial Act violation was not a "defect" in the indictment itself, and was thus insufficient to trigger the savings clause. Because under the amended statute, a "defect" is no longer required, Shipsey's reliance on *Peloquin* is unavailing.

We have construed the amended version of § 3288 in only one published opinion, *United States v. Clawson*, 104 F.3d 250 (9th Cir.1996). In *Clawson*, the district court dismissed the original indictment, charging a conspiracy and mail fraud, because it failed to allege an overt act within the statute of limitations period. The government promptly obtained a superseding indictment to correct the error. By then, however, the statute of limitations had run as to all of the defendant's involvement in the conspiracy. We held that the government was entitled to the six-month grace period:

> Clawson urges us to read the last sentence of section 3288 as barring the use of the section's savings provision whenever an indictment is dismissed because of failure to comply with the statute of limitations. But the sentence says more: It denies the government the six-month extension if an indictment is dismissed for failure to meet the statute of limitations "or some *other* reason that would bar a new prosecution." Read in its entirety, this last sentence cuts off the six-month grace period only where the defect—whether it's a limitations problem "or some other" problem—is not capable of being cured.

*Id.* at 252 (emphasis in original). We concluded that where an original indictment is brought within the limitations period, but is dismissed for failure to allege the exact elements of the crime or some other technicality, the savings clause "merely allows the government to do what it had a right to do in the first place." *Id.*[7]

---

**6.** The amendment to § 3288 was derived from the section 182 of Senate Bill 2485, the Minor and Technical Criminal Law Amendments Act of 1988. The legislative history of the amendment makes clear that Congress specifically intended to legislatively overturn the decision in *Peloquin*. *See* 134 Cong. Rec. 13785–86 (1988).

**7.** In *Clawson*, we distinguished the situation of an indictment that was originally untimely;

As in *Clawson*, the Speedy Trial Act violation at issue here was capable of being cured to permit the government to do what it had a right to do in the first place, i.e., retry the hung jury counts after Shipsey's first appeal was concluded. Bearing most heavily on the § 3288 analysis must be the fact that the district court's speedy trial analysis led to its dismissing the counts without prejudice, the propriety of which Shipsey does not contest on appeal. Had the government still been within the original statute of limitations period when the without-prejudice dismissal was entered, it would not have been barred from refiling the charges. Accordingly, we conclude that, where as here, the original indictment was timely returned, § 3288 allows reindictment within the grace period, where a Speedy Trial Act dismissal after the statute of limitations' expiration is without prejudice.

### VI.

■■■■ Next, Shipsey argues that the wirings of funds established by the government were too tangential to the alleged scheme to defraud to support the convictions.[8] He focuses upon the fact that his allegedly fraudulent draws were sent to First Cal, while the wirings were between the Pension Funds and American Security Bank. He argues that the only rational inference permitted by the evidence is that it was "irrelevant" to Shipsey whether the Pension Funds ever wired money to American Security Bank. To put it simply, Shipsey's argument ignores the totality of the government's evidence, which established that the wirings were caused to occur based upon his fraudulent misrepresentations. Coupled with the government's evidence that Shipsey knew how the loan transaction was structured, we find it established that the wirings were in furtherance of the scheme to defraud.

■■■■ Wire fraud has three elements: (1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud. *See* 18 U.S.C. § 1343;[9] *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir.2001); *United States v. Bonallo*, 858 F.2d 1427, 1433 (9th Cir.1988). Each use of the wires constitutes a separate violation of the wire fraud statute. *Garlick*, 240 F.3d at 792. "In general, to be in furtherance of a scheme, the charged mailing or wire transmission need not be an essential element of the scheme, just a 'step in the plot.'" *Id.* at 795 (quoting *Schmuck v. United States*, 489 U.S. 705, 711, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)).

■■■■ *Schmuck* involved an automobile *wholesaler* who rolled back odometers on used cars. The mailings[10] established by

allowing reindictment under § 3288 in that case would "obliterate" the statute of limitations. 104 F.3d at 252.

8. Claims of insufficient evidence are reviewed de novo. *United States v. Antonakeas*, 255 F.3d 714, 723 (9th Cir.2001). There is sufficient evidence to support a conviction if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

9. "Whoever, having devised or intending to devise any scheme or artifice to defraud, or

for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

10. It is well settled that cases construing the mail fraud and wire fraud statutes are applicable to either. *Carpenter v. United States*, 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987).

the government occurred when the automobile *retailer* further down the delivery chain mailed the title applications to the Wisconsin Department of Transportation on behalf of the purchaser of the altered odometer vehicles. Like Shipsey, Schmuck argued that the mailings occurred after the fraud had already come to fruition and were thus merely tangentially related to the fraud. *Id.* The Court concluded that, given the evidence of the large scale nature of the ongoing scheme, rather than a one-shot operation, a rational jury could have concluded that the success of the venture depended upon the smooth flow of cars from the retailers to the customers and, thus, the registration mailings were "'incident to an essential part of the scheme.'" *Id.* at 711–12, 109 S.Ct. 1443 (quoting *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954)).

·In reaching its conclusion, the *Schmuck* court distinguished the same three cases relied upon here by Shipsey, *Kann v. United States,* 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), *Parr v.· United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), and *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). *Kann* involved corporate officers who set up a dummy company to divert profits. They caused the corporation to issue checks they cashed at a local bank. The local bank then mailed the checks to the drawee bank for payment. The Court found the mailing to be insufficient, holding "[i]t was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank." *Kann,* 323 U.S. at 94, 65 S.Ct. 148. *Parr* involved an unauthorized use of a school district's credit card to obtain gasoline. The mailings occurred when the oil company sent the bill to the school district and the school district mailed back payment. Relying on *Kann,* the *Parr* court found the mailings were insufficient because it was

immaterial to the defendants how the oil company collected the payment. *Parr,* 363 U.S. at 393, 80 S.Ct. 1171. *Maze* also involved a stolen credit card, used to pay for lodging at a motel. The mailing was the innkeeper's transmittal of the invoice to the credit card company. Like in *Parr,* the Court found the mailings insufficient because the defendant's scheme reached fruition when he checked out of the motel; which victim ultimately bore the loss was immaterial to the scheme. *Maze,* 414 U.S. at 402, 94 S.Ct. 645.

As in *Kann, Parr,* and *Maze,* the relationship here between the wirings and Shipsey's scheme—on the surface at least—concerned the "repayment" by a third party of the diverted monies. The difference, however, is clearly distinguishing. Shipsey's scheme did not "reach fruition" when he sent the fraudulent draw requests to First Cal. The government's evidence established that Shipsey knew the Pension Funds were the ultimate source of the loan capital and would ultimately bear the loss. He also had knowledge of the approval process. First Cal could not have funded the draw requests without the wired reimbursements from the Pension Funds. Thus, the "repayment" was not wired or mailed by an otherwise disinterested third party. The question of who would ultimately bear the loss of the fraud was not immaterial to Shipsey; the wirings were clearly "incident to an essential part of the scheme."

## VII.

▪ This same evidence also refutes Shipsey's argument that there was insufficient evidence to support the verdict on theft from a pension fund. Counts 13–16 charged violations of 18 U.S.C. §§ 664 and 2. Section 664 provides in pertinent part:

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of

another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C. § 664. Employee welfare benefit and pension plans are further defined as any plan governed by Title I of ERISA. *Id.* Title 18 U.S.C. § 2(b) is the general federal criminal statute governing the liability of principals.[11] These counts also incorporated by reference Paragraph 6 of the superseding indictment, which outlined Shipsey's scheme to defraud. It provided in part that "as a consequence of the false representations ... First California Mortgage Company and McMorgan and Company authorized the release of money from the Pension Fund accounts."

Shipsey's sufficiency-of-the-evidence argument goes as follows: his loan agreement was only with First Cal, he sent the draw requests only to First Cal, and only First Cal funded the draw requests. Thus, there was a failure of proof that he stole from an ERISA-governed entity; where First Cal got its capital, and whether it had a legal entitlement to reimbursement from the Pension Funds, did not establish a theft by him of pension fund money. The government agrees that Shipsey did not receive money directly from a pension fund. Nonetheless, it argues there was sufficient evidence of criminal liability because the indictment charged a violation of § 664 in conjunction with § 2(b) and the government proved that Shipsey, as a principal, caused the transfer of pension fund assets by others, thereby illegally benefitting Shipsey and impairing the Pension Funds' collateral in Stonefield. We agree.

It is irrelevant that Shipsey did not steal *directly* from a pension fund, given the government's theory that he is liable under § 2(b) as a principal. The evidence established that Shipsey willfully caused the reimbursement wire transfers from the Pension Funds to First Cal's account when he submitted the false draw requests containing the misrepresentations that caused them to be approved. A rational trier of fact could have found that Shipsey "caused" the unauthorized takings of fund assets from the evidence that he knew how the loan was structured, his misrepresenting his entitlement to draws on the underlying construction loan, and the government's ample proof of the diversions through over billings, double billings and kickbacks.

■ We must address, however, whether the use of this causation theory was an improper amendment of the crime the grand jury charged in the indictment.[12]

---

11. "Whosoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

12. This issue of constructive amendment was also raised in Shipsey's first appeal, and was the reason his original convictions were vacated. In Shipsey's first appeal, we found a constructive amendment had occurred. The original indictment charged Shipsey stole pension fund assets by use of false pretenses. The district court, however, never instructed the jury on theft by false pretenses. Rather, the district court's instructions in the first trial permitted the jury to convict on a theory that he obtained the pension fund money by a "wrongful act" or if he converted the money. *Shipsey I*, 190 F.3d at 1086. We found this was a constructive amendment to the indictment, and not merely a non-prejudicial variance, because it permitted the petit jury to convict on a theory of theft not charged by the grand jury. Nowhere in the original indictment, we held, was there a statement of facts and circumstances that would support other possible § 664 theft theories. As the original indictment gave Shipsey notice only of the false pretenses theory, we found the govern-

We most recently reviewed the law regarding constructive amendment in *United States v. Adamson,* 291 F.3d 606 (9th Cir. 2002):

> An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect by the prosecutor or a court after the grand jury has last passed upon them. A variance, on the other hand, occurs when . . . the evidence offered at trial proves facts materially different from those alleged in the indictment.
>
> The line between a constructive amendment and a variance is at times difficult to draw. . . .
>
> In our efforts to draw this line, we have found constructive amendment of an indictment where (1) there is a complex of facts [presented at trial] distinctly different from those set forth in the charging instrument, or (2) the crime charged [in the indictment] was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved.
>
> Although a constructive amendment usually involves a complex of facts, we have generally found a variance where the indictment and the proof involve only a single, though materially different, set of facts.

*Id.* at 614–15 (citations and internal quotation marks omitted).

On retrial, the district court, over Shipsey's objection, included in its charge on the law of false pretenses the government's "willful causation of a transfer" theory. It charged that the jury must find "the defendant knowingly and willfully caused a transfer of money that belonged to the employee plan with the intent to deprive the employee benefit plan of the

benefit of ownership or possession of that money." There was no constructive amendment of the indictment arising from this instruction. There was only "one complex of facts" alleged in the indictment and proved at trial—the false-pretenses scheme to divert loan proceeds from Stonefield to pay for Obertz through the use of fraudulent draw requests. Shipsey argues the difference between the literal terms of the indictment and the jury instructions was that the jury instructions permitted a conviction if the proof at trial showed Shipsey received the loan proceeds from First Cal, rather than directly from the Pension Funds. This assertion elevates form over substance. The Pension Funds' contractually obligated reimbursements of First Cal rendered the theft—in economic reality—a theft of pension money. In addition, the crime proved by the trial evidence was not "substantially altered" from the one charged in the indictment, since the grand jury recited that "Shipsey entered into a $19,400,000 loan agreement with First California Mortgage Company which assigned all of its rights, title and interests in the construction loan agreement to First Interstate Bank of California, corporate co-trustee for [the Pension Funds]," and alleged liability under 18 U.S.C. § 2(b) in conjunction with § 664. Thus, we can know with certainty that the grand jury knew of the government's transfer theory, and indicted Shipsey for the indirect theft of the pension assets via the fraudulently induced loan draws from First Cal.

AFFIRMED.

*ment was obliged to prove this theory.  Id.* at     1087.