**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JAMES ROBERT MILLER,
*Defendant-Appellant.*

Nos. 17-50338
18-50449

D.C. No.
2:14-cr-00471-GW-1

OPINION

Appeal from the United States District Court
for the Central District of California
George Wu, District Judge, Presiding

Argued and Submitted January 10, 2020
Pasadena, California

Filed March 20, 2020

Before: Paul J. Watford and Mark J. Bennett, Circuit
Judges, and Jed S. Rakoff,* District Judge.

Opinion by Judge Rakoff

---

*The Honorable Jed S. Rakoff, United States District Judge for the
Southern District of New York, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed a conviction for wire fraud and filing false tax returns in a case in which a jury found that the defendant embezzled over $300,000 from the company for which he served as manager and president.

Overruling prior decisions of this court in light of the Supreme Court's intervening decision in *Shaw v. United States*, 137 S. Ct. 462 (2016), the panel held that wire fraud under 18 U.S.C. § 1343 requires the intent to deceive *and* cheat — in other words, to deprive the victim of money or property by means of deception — and that the jury charge instructing that wire fraud requires the intent to "deceive *or* cheat" was therefore erroneous. The panel nevertheless held that the erroneous instruction was harmless.

The panel wrote that it was deeply troubled by the disregard of elementary prosecutorial ethics by an Assistant U.S. Attorney from the Central District of California who, with a personal and financial interest in the outcome of this case, impermissibly tainted the prosecution by involving himself in the early stages of the investigation and then continuing to express interest even after the U.S. Attorney's Office for the Central District recused itself from the matter. The panel held that the misconduct of the AUSA does not entitle the defendant to any relief because as soon as the Department of Justice became aware of the impropriety, it

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

took every necessary step to cure any resulting taint, including turning over the entire prosecution to disinterested prosecutors from the Southern District of California.

The panel held that the district court correctly denied the defendant's motion for a new trial, and did not abuse its discretion in denying his motion for an indicative ruling on additional discovery, based on a special agent's failure to disclose his romantic relationship with an AUSA in the recused Central District office. The panel concluded that there was sufficient evidence to establish the interstate wire element of the wire fraud offenses.

## COUNSEL

Katherine Kimball Windsor (argued), Law Office of Katherine Kimball Windsor, Pasadena, California, for Defendant-Appellant.

Rebecca Suzanne Kanter (argued), Assistant United States Attorney; Daniel E. Zipp, Special Attorney for the United States; Robert S. Brewer Jr., United States Attorney; William P. Barr, United States Attorney General; United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

**OPINION**

RAKOFF, District Judge:

A jury in the Central District of California convicted defendant-appellant James Miller of five counts of wire fraud and four counts of filing false tax returns, finding that he had embezzled over $300,000 from the company for which he served as managing member and president. Miller now appeals his conviction, as well as the district court's denial of various pre- and post-trial motions seeking dismissal of the indictment, additional discovery, and other forms of relief.

This appeal presents two main questions. The first is whether the jury charge misstated the law by instructing that wire fraud under 18 U.S.C. § 1343 requires the intent to "deceive *or* cheat" rather than the intent to "deceive *and* cheat." We conclude that the charge was erroneous. Several other circuit courts have long held that the crime of wire fraud requires the specific intent to utilize deception to deprive the victim of money or property, i.e., to cheat the victim, and we now align the law of the Ninth Circuit with that of the other circuits and with recent Supreme Court precedent. Nevertheless, we find that the erroneous instruction was harmless in this case.

The second question here presented is whether an Assistant U.S. Attorney (AUSA) from the Central District of California who had a personal and financial interest in the outcome of this case impermissibly tainted the prosecution by involving himself in the early stages of the investigation and then continuing to express interest in the case even after the entire U.S. Attorney's Office for the Central District of California recused itself from the matter. We are deeply troubled by this Assistant's disregard of elementary

prosecutorial ethics. But we also note that as soon as the Department of Justice became aware of the impropriety, it took every necessary step to cure any resulting taint, including turning over the entire prosecution of the case to disinterested prosecutors from the Southern District of California. We therefore hold that the misconduct of the Central District Assistant does not entitle Miller to any relief.

Because we also find Miller's remaining arguments to be without merit, we affirm his conviction.

## Background

Trial testimony established that, during the relevant time period, defendant-appellant James Miller served as the president and managing member of an online retail platform called MWRC Internet Sales, LLC. Some years earlier, an entrepreneur named Russell Lesser, who was Miller's long-time friend, had founded MWRC and recruited Miller to work for the company. As he took on more senior roles, Miller's job responsibilities grew to include management of MWRC's day-to-day finances, with limited oversight by Russell Lesser.

In 2009, Miller, who was experiencing personal financial difficulties, began writing himself checks from one of MWRC's bank accounts. He did so without the knowledge or consent of Russell Lesser or anyone else at MWRC. By the end of 2010, he had issued a total of about $130,000 to himself and had paid back roughly $30,000. In March 2011, Miller disclosed to Russell Lesser a hint of what he had done, but falsely told Lesser that he had only written himself checks totaling $30,000. Upon hearing this, Lesser told Miller, "you can't do that. That is stealing." Miller then expressed remorse and promised to never write himself checks again.

Miller only kept this promise for two months. He then wrote himself another $3,000 check on April 29, 2011, and over the rest of 2011 and 2012, wrote himself around fifty additional checks from MWRC, totaling additional amounts of another $200,000 or so. To disguise his payments, Miller often listed them in MWRC's ledger as internal transfers between the company's two bank accounts. Russell Lesser eventually noticed that these ledger entries did not correspond to actual deposits into the purported recipient account. He then obtained bank records and cancelled checks, which led to his discovery of the continuing check-writing fraud. By the time of this discovery, Miller had embezzled about $330,000 from MWRC.[1] Miller had also failed to report any of this money as income on his tax returns.

Based on the foregoing, a grand jury indicted Miller on five counts of wire fraud in violation of 18 U.S.C. § 1343 and four counts of filing false federal tax returns in violation of 26 U.S.C. § 7206(1). Miller pled not guilty on all counts and proceeded to trial in June 2017. His chief defense was that he always intended to (and eventually did) pay back the full amount he had taken from MWRC. He also argued that he always believed the funds to be loans that he was authorized to issue to himself. At the conclusion of trial, however, the jury convicted Miller on all counts.

On September 11, 2017, the trial court sentenced Miller to nine months' imprisonment, to run concurrently on all counts, two years of supervised release, and a special

---

[1] At this point, Miller had repaid to MWRC about $95,000 of the embezzled funds. Of course, subsequent repayment is of itself no defense to embezzlement or wire fraud, though it may bear on the issue of intent.

assessment of $900. Miller is on bail pending disposition of this appeal.

At trial, Miller requested a jury instruction stating that, to be guilty of wire fraud, he must have intended to "deceive and cheat" MWRC. The trial court, however, delivered the Ninth Circuit's model jury instruction, which states that wire fraud instead requires only the intent to "deceive *or* cheat" (emphasis supplied) the victim. As his first issue on this appeal, Miller argues that this jury instruction misstated the law.

The facts that give rise to Miller's second issue on appeal occurred early in the investigation of this case. Indeed, Miller goes so far as to speculate about whether law enforcement would even have investigated him in the first place were it not for the early involvement of Russell Lesser's son, Gregory ("Greg") Lesser, an AUSA in the U.S. Attorney's Office for the Central District of California and himself a 1.25% member of MWRC. Upon learning from his father of Miller's embezzlement, Greg Lesser called a friend at the FBI to report Miller.[2] This outreach, Miller argues, may well have expedited, or otherwise influenced, the agency's decision to open an investigation and to begin coordinating with prosecutors in the Central District office. In addition, over the next three weeks, the FBI arranged a meeting at which Russell Lesser, wearing a wire, confronted

---

[2] Specifically, AUSA Lesser reached out to a friend at the FBI, who put the Lessers in touch with another agent. That agent in turn referred the case to Special Agent Joseph Swanson "to open an investigation." Shortly thereafter, Swanson called Greg Lesser to inform him that the FBI would be reaching out to the U.S. Attorney's Office about the Miller matter.

Miller about his check-writing, leading to some admissions from Miller.[3]

It was not until approximately three weeks after he had first called his friend in the FBI that Greg Lesser reported his obvious conflict-of-interest in the Miller case to his supervisor in the Central District. At that point the supervisor recused the entire office and turned over the matter to the U.S. Attorney's Office for the Southern District of California.[4] However, unbeknownst to the Southern District prosecutors, Greg Lesser continued for a while to maintain a tangential but still inappropriate level of involvement in the case. For example, as detailed below, AUSA Lesser had additional direct and indirect contact with Special Agent Swanson concerning the progress of the case.

The Government disclosed all of this to Miller well in advance of trial, at which point Miller filed a motion for additional discovery into Greg Lesser's involvement in the case. The district court denied this motion except to order the Government to produce the grand jury testimony from Miller's indictment proceedings in order to confirm that the grand jury was not presented with testimony that was tainted by Greg Lesser's involvement. After the Government produced the grand jury transcripts, Miller filed a motion to dismiss the indictment with prejudice on two grounds. First, Miller moved to dismiss the indictment under the Due

---

[3] At this meeting, Lesser asked, "[D]o you admit that's money that's been stolen?" and Miller replied, "Yes. Well . . . [w]ith an intention to repay." Miller also acknowledged that he had used some of the money to make payments on his personal mortgage and credit card debt.

[4] The Southern District prosecutors who handled the matter still, of course, prosecuted the case in the Central District, where most of the underlying events occurred.

Process Clause of the Fifth Amendment or, alternatively, under the trial court's supervisory powers, because of Greg Lesser's role as an interested prosecutor. *See United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991). Second, Miller moved to dismiss the indictment under the Due Process Clause because of allegedly false testimony that was presented to the grand jury. The district court denied both grounds, leading to Miller's second main issue on this appeal.

## Discussion

### I. The Jury Instructions

At trial, the Government requested that the court charge the jury that, to be guilty of wire fraud, a defendant must have acted with the intent to "deceive *or* cheat." As thus stated in the alternative, Miller could theoretically have been convicted of deceiving MWRC (as, for example, through the false ledger entries), even if he had no intent to cheat MWRC, that is to, "deprive [MWRC] of something valuable by the use of deceit or fraud," Merriam-Webster's Collegiate Dictionary, 10th ed. (1997). The defense, based on its view that Miller's alleged belief that his withdrawals were simply "loans" meant that he lacked an intent to cheat, requested an instruction that wire fraud requires the intent to "deceive *and* cheat." Over the defense's objection, but in line with existing Ninth Circuit pattern instructions, the district court gave the Government's proposed instruction, and Miller now appeals his conviction on the ground that this instruction misstated the law.

We review *de novo* whether a trial court's jury instructions correctly stated the elements of a crime, *United States v. Anguiano-Morfin*, 713 F.3d 1208, 1209 (9th Cir. 2013), and we have no trouble concluding that this

instruction was erroneous. Like the mail fraud statute from which it is derived, the wire fraud statute, in plain and simple language, criminalizes the use of interstate wires to further, not mere deception, but a scheme or artifice to defraud or obtain money or property, i.e., in every day parlance, to cheat someone out of something valuable. It follows that to be guilty of wire fraud, a defendant must act with the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions. In other words, a defendant must intend to deceive *and* cheat.

This has long been the law of several other circuits. For example, in *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993), the court reviewed the conviction for mail fraud[5] of a sports agent who had defrauded the NCAA, not by stealing its property, but by inducing college athletes to sign secret representation contracts in violation of the Association's rules. In other words, Walters had deceived, but not cheated, his victim. The Seventh Circuit reversed Walters' conviction, holding that the statute requires "a scheme to obtain money or other property from the victim," and that "[l]osses that occur as byproducts of a deceitful scheme do not satisfy the statutory requirement." *Id.* at 1227.

Other circuits have held similarly. The Second Circuit had already concluded as much some two decades before *Walters*, holding in *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970) that "the

---

[5] Although Walters was prosecuted under the mail fraud statute, 18 U.S.C. § 1341, courts typically interpret the mail and wire fraud statutes the same way, as their language is largely identical. *See, e.g.*, *United States v. Kuecker*, 740 F.2d 496, 504 (7th Cir. 1984); *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016).

government can[not] escape the burden of showing that some actual harm or injury [to the victim's money or property] was contemplated by the schemer." *See also United States v. Starr*, 816 F.2d 94, 101 (2d Cir. 1987) ("[I]t is error for a trial judge to charge a jury that contemplated harm is *not* an element of fraudulent intent."). The D.C. Circuit has also agreed, at least in dicta. *United States v. Lemire*, 720 F.2d 1327, 1335–36 (D.C. Cir. 1983) ("[T]here is judicial consensus about certain requisite elements of a scheme to defraud. . . . [T]he scheme to defraud must threaten some cognizable harm to its target. . . ."). *See also, e.g.*, *United States v. Allen*, 491 F.3d 178, 187 (4th Cir. 2007) (upholding a jury instruction that, for the purposes of the wire fraud statute, to act with the intent to defraud means "to act knowingly and with the specific intent to deceive, for the purposes of causing some financial or property loss to another"); 2 Sand et al. *Modern Federal Jury Instructions*, Instruction 44-5 (2019) ("'Intent to defraud' means to act knowingly and with the specific intent to deceive, for the purpose of causing some financial or property loss to another.").

The Ninth Circuit, on the other hand, employs the "deceive or cheat" language in its model jury instruction on wire fraud, *Manual of Modern Criminal Jury Instructions for the District Courts of the Ninth Circuit* § 8.124 (2019), and this court has upheld this instruction on at least three occasions in the past. *United States v. Shipsey*, 363 F.3d 962, 967 (9th Cir. 2004); *United States v. Treadwell*, 593 F.3d 990, 998–99 (9th Cir. 2010); *see United States v. Livingston*, 725 F.3d 1141, 1148 (9th Cir. 2013). Nor is this the only circuit that uses the "deceive or cheat" language. *See Treadwell*, 593 F.3d at 999 (citing the model instructions of the Third, Fifth, Sixth, Tenth, and Eleventh Circuits as support for the "deceive or cheat" formulation).

But we think that these holdings are no longer tenable in light of the Supreme Court's intervening ruling in *Shaw v. United States*, 137 S. Ct. 462 (2016). Indeed, another panel of this court has already acknowledged as much in a non-precedential memorandum disposition. *United States v. George*, 713 F. App'x 704, 705 (9th Cir. 2018).**[6]** In *Shaw*, the Supreme Court considered a jury instruction defining "scheme to defraud" for the purpose of the bank fraud statute**[7]** as "any deliberate plan of action or course of conduct by which someone intends to deceive, cheat, *or* deprive a financial institution of something of value." *Id.* at 469. The Court cast serious doubt on the accuracy of this instruction on the ground that "the scheme must be one to deceive the bank *and* deprive it of something of value."**[8]** *Id.* We think that this language and reasoning clearly control here. Although the wording of Shaw's instruction was not identical to Miller's, both arguably allowed a jury to convict "if it found no more than that [the defendant's] scheme was one to deceive the [victim] but not to '*deprive*' the [victim] of anything of value." *Id.* In light of *Shaw*, we therefore overrule our prior cases on this question and hold that wire fraud requires the intent to deceive *and* cheat — in other

---

**[6]** *But see United States v. Stewart*, 728 F. App'x 651, 653 (9th Cir. 2018) (affirming the "deceive or cheat" instruction without analyzing it in light of *Shaw*).

**[7]** 18 U.S.C. 1344(1). Because the bank, mail, and wire fraud statutes all use highly similar language, we take the Supreme Court's reasoning in *Shaw* to apply to the wire fraud statute as well.

**[8]** The Court remanded the case to the Ninth Circuit for us to determine whether the instruction was lawful. 137 S. Ct. at 470. On remand, a panel of this court held that this argument was not properly preserved below, and, in any case, any error in the instruction was harmless. *United States v. Shaw*, 885 F.3d 1217 (9th Cir. 2018).

words, to deprive the victim of money or property by means of deception.

Despite this error in the jury charge, however, we affirm Miller's conviction on the ground that the error was harmless. *See United States v. Wilkes*, 662 F.3d 524, 544 (9th Cir. 2011). It is true that the Government emphasized the "deceive or cheat" distinction in its summation, arguing to the jury that Miller's false checkbook entries were sufficient to demonstrate intent to deceive, and therefore sufficient evidence that Miller had the mens rea for wire fraud.[9] Nevertheless, we still find beyond a reasonable doubt that the jury would have convicted Miller even if it had been properly instructed, for two reasons:

First, Miller's primary defense — that he was not guilty of wire fraud because he intended to pay back the funds he deceptively obtained from MWRC — is not a defense at all. In *United States v. Treadwell*, this court already considered and rejected the argument that the wire fraud statute requires an intent to permanently deprive a victim of money or property.[10] 593 F.3d at 996–98 (citing with approval *United States v. Hamilton*, 499 F.3d 734, 736 (7th Cir. 2007) ("If you embezzle from your employer you are not excused just because you had an honest intention of replacing the money,

---

[9] The falsified ledger entries were, to be sure, also strongly probative of Miller's intent to *cheat*, and the jury may properly have considered them in that light.

[10] To be clear, we overrule *Treadwell* in part, insofar as we hold that the "deceive or cheat" instruction misstates the requirement that wire fraud requires the intent to deprive a victim of money or property, at least momentarily. But nothing in *Shaw* compels us to go so far as to hold that wire fraud requires an intent to *permanently* deprive the victim of property. We know of no cases that so hold, and appellant cites none.

maybe with interest . . . ."). Intent to repay, therefore, is not a defense to wire fraud.

Second, Miller's only other material defense was that, at the very time he obtained the funds, he believed the funds to be bona fide loans that he was fully authorized to issue to himself, albeit by means of the deceptive ledger entries. This defense did, in effect, raise the claim that Miller, while intending to deceive, did not intend to cheat. But we are persuaded, based on other language in the jury instructions, that there is no way the jury made this determination. Most importantly, the district court's instruction on the "scheme to defraud" element of the wire fraud counts told the jury that it must find that Miller "knowingly engaged in a scheme or plan to defraud or obtain money or property by means of false or fraudulent pretenses, representations, or promises." If the jury had believed that there was any inconsistency between this language and the subsequent language about "deceive or cheat," they undoubtedly would have sought further instruction, which they did not. Further, any notion that the jury thought that Miller was guilty of deception, but not cheating, because he allegedly had permission to give himself loans from company funds is flatly contradicted by the jury's conviction on all the tax counts. This is because the jury was expressly instructed that "[t]he proceeds of a loan are not taxable income," and that Miller could not be convicted of filing a false tax return unless he did so "willfully." So instructed, the jury could only have convicted Miller of the tax counts if they found beyond a reasonable doubt that he did not really believe that the funds he took from the company were bona fide loans. For these reasons, we hold that the error in the jury instructions was harmless.

## II.  The Interested Prosecutor

"A prosecutor has the responsibility of a minister of justice and not simply that of an advocate." Model Rules of Professional Conduct Rule 3.8 Cmt. 1. She represents not her own interest but "the interest of society as a whole." *Ferri v. Ackerman*, 444 U.S. 193, 202–03 (1979). For this very reason, the Department of Justice holds United States Attorneys and their Assistants to exacting ethical standards, not least with respect to actual and apparent conflicts of interest. *See, e.g.*, U.S. Attorneys' Manual § 1-4.320(F) ("Employees may not engage in outside activities that create or appear to create a conflict of interest with their official duties. Such a conflict exists when the outside activity would . . . create an appearance that the employee's official duties were performed in a biased or less than impartial manner."). Moreover, federal law itself contains a criminal prohibition on prosecutors and other government employees "participat[ing] personally and substantially" in a "judicial or other proceeding" in which they have an interest. 18 U.S.C. § 208.

AUSA Greg Lesser's role in the Miller prosecution, however limited, was a clear violation of his ethical and professional duties. Nothing, of course, prevented his father from reporting the embezzlement to the FBI, as through a public tip line or the like. But it was totally inappropriate for AUSA Lesser to, at a minimum, create the appearance of having used his personal contacts in the Bureau as a means to pull strings in favor of an investigation.[11] *See* U.S.

---

[11] We observe, as does Miller, that the FBI did not produce any "302 reports" detailing its contacts with Greg Lesser, as it would typically have done to memorialize contacts with a complaining witness.

Attorneys' Manual § 9-27.260(A)(3) ("In determining whether to commence or recommend prosecution or take other action against a person, the attorney for the government should not be improperly influenced by . . . [t]he possible affect [sic] of the decision on the attorney's own professional or personal circumstances."). And his errors compounded: after helping to initiate the Miller investigation, Lesser faced an obvious duty to report his conflict of interest (and presumptive recusal) to his supervisor as soon as possible. *See* U.S. Attorney's Manual § 3-2.170 ("A United States Attorney who becomes aware of circumstances that might necessitate his or her recusal or that of the entire office, should *promptly* notify [the general counsel's office] to discuss whether a recusal is required.") (emphasis supplied); *id.* § 3-2.220 (same recusal rules apply to AUSAs). Instead, inexplicably, he waited three weeks to disclose his conflict, even while his father was, at the behest of the FBI, secretly recording a conversation with Miller.

Just as concerning are AUSA Lesser's apparent continued attempts to involve himself in the Miller case even after the Central District's recusal. For example, in January 2013, AUSA Lesser called Special Agent Swanson to inquire, "in his capacity as part-owner (or part-shareholder) of MWRC," about the status of the case.[12] At some point after that, Greg Lesser solicited his colleagues' help through his work e-mail to track down information on Mr. Miller's employment history. These attempts represented a

---

This implies that the FBI agents viewed Greg Lesser, at least initially, not as a witness, but as the prosecutor.

[12] Special Agent Swanson merely replied that the investigation was ongoing.

continuing violation of Greg Lesser's ethical obligations as an Assistant United States Attorney.

The question before us, however, is not whether AUSA Lesser acted improperly, which is clear. Our question is whether Lesser's ethical and professional lapses entitle Miller to dismissal of the indictment. We review the district court's denial of Miller's motion to dismiss on Due Process grounds *de novo*, and we review for abuse of discretion the district court's decision not to dismiss the indictment under its supervisory powers. *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991); *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991).

Although we have held that a prosecutor may violate a defendant's Due Process rights through conduct that "is so grossly shocking and so outrageous as to violate the universal sense of justice," *Restrepo*, 930 F.2d at 712 (quoting *United States v. O'Connor*, 737 F.2d 814, 817 (9th Cir. 1984)), we think that the facts of this situation do not rise to that level, chiefly because the prosecutorial improprieties had no material effect on the case and because the Department of Justice took every step it could reasonably have been expected to take to cleanse the Miller prosecution of any possible taint from AUSA Lesser's involvement. Most significantly, after the Central District of California recused itself from any further involvement in the prosecution, an AUSA from the Southern District of California took over the case. She had no contact with Lesser whatsoever, and she came to an independent decision on whether and how to charge Miller. And although AUSA Lesser's limited attempts to involve himself in the case after the Central District's recusal were more than sufficient to create an appearance of impropriety, there is no indication that Lesser in any way influenced the prosecutor who was

actually in charge of the case at that time. Further, even during the three weeks before the Central District's recusal, there is no evidence that AUSA Lesser himself, rather than Special Agent Swanson, was directing the investigation of Miller.

On the same analysis, the facts of this situation do not implicate the Supreme Court's holding in *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987), the chief case on which Miller relies. In *Young*, the Court exercised its supervisory powers to reverse the criminal contempt convictions of four defendants because the prosecutor who prosecuted the case and obtained those convictions was conflicted. Indeed, the conflict was extreme, as the prosecutor, specially appointed by the district court, was also serving as counsel to the party that was the beneficiary of the injunction that defendants were being prosecuted for civilly violating. *Id.* at 790. By contrast, AUSA Lesser was not in any material respect Miller's prosecutor. At most, AUSA Lesser may have induced the FBI to look at the case more closely than it might otherwise have in the case's early stages. In any event, given the blatant evidence of embezzlement, it would not have taken much to catch the FBI's attention if, instead, it had been reported by Russell Lesser instead of Greg Lesser, as it most likely would have been. And all the crucial decisions in the investigation and prosecution were made by Special Agent Swanson and the Southern District AUSA who took over the case from the Central District. The district court therefore did not abuse its discretion in denying Miller's motion to dismiss the indictment under the court's supervisory powers.[13]

---

[13] For the same reasons, the district court also did not abuse its discretion in denying Miller's motion for additional discovery beyond

Miller also argues that the district court erred in denying his motion to dismiss on the ground that the grand jury received materially false testimony.[14] "[T]he Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached." *United States v. Basurto*, 497 F.2d 781, 785 (9th Cir. 1974). But here, the false testimony Miller cites — a statement by an FBI agent that Russell Lesser was the *majority* shareholder of MWRC (while, in reality, Russell Lesser was simply a *plurality* shareholder, owning an 18% interest in the company) — was not remotely material.[15] The defense argues that the testimony was material because it gave the impression that Russell Lesser had total authority over MWRC, thus potentially leading the grand jury to discount the idea that Miller believed he was authorized to lend himself company money. But the grand jury also heard testimony that Miller had admitted to Lesser that he had taken the funds without authorization. Moreover, the petit jury also considered and rejected this defense at trial, therefore rendering any error in the grand jury testimony harmless. *United States v. Bingham*, 653 F.3d 983, 998 (9th

that discussed below. *See United States v. Mazzarella*, 784 F.3d 532, 537 (9th Cir. 2015).

[14] The district court ordered the Government to produce these transcripts so that the defense could examine "if, for example, Lesser was creating false evidence or something of that sort."

[15] Miller also points to testimony heard by the grand jury that he had only paid back $40,000 of the roughly $330,000 he took from MWRC, while in fact he eventually paid back the entire amount. This is also immaterial, however, because failure to repay is not an element of wire fraud, and intent to repay is not a defense. *See supra* pp. 13–14.

Cir. 2011) (holding that, after a petit jury convicted the defendant on all counts, "any error in the grand jury proceeding connected with the charging decision is deemed harmless beyond a reasonable doubt") (quoting *People of Guam v. Muna*, 999 F.2d 397, 399 (9th Cir. 1993)). The district court accordingly did not err in rejecting this Due Process claim.

## III.    Additional Arguments

Miller raises two additional arguments, but both are unpersuasive and do not provide a basis for reversal.

First, Miller challenges the district court's denial of his post-conviction motion for an indicative ruling on additional discovery and/or a new trial based on the disclosure of a romantic relationship between Special Agent Swanson and an AUSA in the recused Central District office.[16] Defense counsel argues that such evidence would have been material at trial and speculates that "[t]he relationship may also have

---

[16] In October 2017, after Miller's conviction and sentencing, the U.S. Attorney's Office for the Southern District of California learned of an investigation by the Justice Department's Office of Professional Responsibility (OPR) into this previously-undisclosed relationship. The Southern District prosecutors on the Miller case informed defense counsel of this development about a month later, as this appeal was pending. In response, Miller requested discovery from the Government including the name of the AUSA; any communications between this AUSA, Swanson, and/or Greg Lesser concerning the Miller case; and any reports or conclusions from the OPR investigation. The Government voluntarily provided the name of the AUSA, told defense counsel that there were no such communications on their respective government email accounts and that this AUSA had not worked on the Miller case, and noted that the OPR investigation into Swanson had been closed. The district court later denied the motion.

resulted in a significant breach of the recusal order" by creating a back channel to Greg Lesser.

Even if we apply *de novo* review,[17] we hold that the district court correctly denied Miller's motion for a new trial because Special Agent Swanson's failure to disclose his relationship with an AUSA is not sufficiently material to warrant relief. This would have served as impeachment evidence at most, and even if the jury had deeply discounted Swanson's testimony, we are convinced that they still would have convicted Miller. It is true that Swanson was an important Government witness; perhaps most significantly, Swanson testified that Miller had admitted to the FBI that he knew that writing himself checks from MWRC's account was wrong. But this testimony was far from the only evidence establishing Miller's guilt. Not least among the other evidence, the jury still had the wire recording of the November 28, 2012 conversation between Russell Lesser and Miller, in which Miller admits to Lesser's characterization of his activities as stealing and embezzlement, albeit "[w]ith an intention to repay" (which, as noted, is no defense). The jury also heard Lesser's testimony about Miller's 2011 confession and subsequent

---

[17] As a threshold matter, the parties disagree on how to characterize Miller's claim. The defense argues that it is a motion for a new trial based on a *Brady* violation, *see Brady v. Maryland*, 373 U.S. 83 (1963), while the Government argues that it is a Fed. R. Crim. P. 33 motion for a new trial based on newly-discovered evidence. The parties would therefore have us apply different standards of review: we would review the district court's denial of a motion for a new trial based on a *Brady* violation *de novo*, *United States v. Pelisamen*, 641 F.3d 399, 408 (9th Cir. 2011), while we would review the district court's denial of a motion for a new trial based on newly discovered evidence for abuse of discretion, *United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009). For the sake of argument, we apply the standard more favorable to the defense.

continued check-writing, as well as Miller's handwritten ledger entries that disguised his payments to himself as transfers from one of MWRC's bank accounts to another. All of this evidence was highly probative of Miller's guilt, and we accordingly do not find a "reasonable probability" that the jury would have acquitted Miller if it had heard the impeachment evidence about Swanson.[18] *Kyles v. Whitley*, 514 U.S. 419, 421–22 (1995).

On the same analysis, we hold that the district court did not abuse its discretion in denying Miller's motion for additional discovery, since any such discovery would not have produced evidence material to the outcome of the trial. *See United States v. Rivera-Relle*, 333 F.3d 914, 918 (9th Cir. 2003). Finally, any suggestion that the Central District AUSA was serving as a conduit for nefarious communications between Special Agent Swanson and Greg Lesser is pure speculation by defense counsel and does not merit relief.

---

[18] The parties' dispute about whether Miller has stated a *Brady* claim also impacts the materiality standard that we apply. *Brady* evidence is material if the admission of the suppressed evidence would result in a "reasonable probability" of an acquittal. *Kyles*, 514 U.S. at 421–22, i.e., "a probability sufficient to undermine confidence in the outcome of the trial." *United States v. Price*, 566 F.3d 900, 911 (9th Cir. 2009) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985) (plurality)) (internal quotation marks omitted). In contrast, the bar for materiality in a Rule 33 claim is higher. To win a new trial based on newly-discovered evidence, the defendant must show, among other requirements, that "the new evidence is not merely . . . impeaching;" and that it "would probably produce an acquittal." *United States v. Jackson*, 209 F.3d 1103, 1106 (9th Cir. 2000). We need not reach the question of whether Miller has demonstrated *Brady* suppression; since we hold that the evidence is not material under the *Brady* standard, *a fortiori* it is also not material under the Rule 33 standard.

Second, Miller appeals the district court's denial of his motion under Fed. R. Crim. P. 29(c) for a judgment of acquittal on the wire fraud counts based on insufficient evidence of an interstate wire communication. Rule 29(c) requires a trial court to enter a judgment of acquittal if the Government fails to present sufficient evidence to sustain a conviction. Sufficient evidence is that which, "view[ed] . . . in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Dearing*, 504 F.3d 897, 900 (9th Cir. 2007) (internal quotation marks and citations omitted). Because defense counsel made this motion at the close of the Government's evidence and then renewed the motion after the verdict, this Court reviews the district court's ruling *de novo*. *Id.*

We are satisfied that the Government introduced more than sufficient evidence for a rational juror to conclude that Miller utilized at least one interstate wire communication in furtherance of his scheme. The Government called Lynn Flanagan, the former operations manager at the bank where MWRC maintained the account from which Miller fraudulently withdrew funds. She testified that all checks deposited into or drawn out of accounts at the bank are processed via interstate wires, either through the Federal Reserve Bank in Atlanta or Kansas City or through a clearing bank in Wisconsin called FCN.[19] This testimony is sufficient

---

[19] Defense counsel makes much of the fact that Flanagan's testimony as to the location of FCN was, read literally, ambiguous. Referring to FCN (the "Fiserv Clearing Network"), the Government asked Flanagan, "Where is Five Serve [sic] located," and Flanagan answered Wisconsin. But since Flanagan never explicitly defined the acronym FCN, defense counsel argues that a rational juror might have concluded that FCN and "Five Serve" were different entities and that FCN might have been located within California. We think, though, that

evidence to establish the interstate wire element of the § 1343 offenses beyond a reasonable doubt.

## Conclusion

We have considered Miller's remaining arguments and find them totally without merit. Accordingly, for the foregoing reasons, the judgment of the district court is **AFFIRMED**.

---

the correct meaning was obvious from the context. Moreover, the overall thrust of Flanagan's testimony was that all checks drawn on an account at this bank travelled via interstate wire. For example, when asked whether "that transaction that you just described [would] still happen even though both the banks are in California," Flanagan replied, "[y]es, it would. We did not have direct clearing."